STATE OF OHIO, APPELLEE, *v.* RALEY ET AL., APPELLANTS.[*]

*Judgments affirmed, 164 Ohio St., 529.   Rehearing denied March 21, 1956.

(No. 7856—Decided November 15, 1954.)

*Mr. C. Watson Hover,* prosecuting attorney, and *Mr. Carl B. Rubin,* for appellee.

*Mr. Louis C. Capelle, Mr. Morse Johnson, Mr. Milton H. Schmidt* and *Mr. Chester R. Shook,* for appellants.

MATTHEWS, P. J.   The defendants, appellants herein, were indicted separately for contempt of the Ohio Un-American Activities Commission, created and organized in accordance with the provisions of Sections 76-28 to 76-35, inclusive, General Code, as supplemented by the Act of the General Assembly passed on June 1, 1951 (124 Ohio Laws, 795), now Sections 103.31 to 103.38, inclusive, Revised Code.   By agreement the cases were consolidated for trial in the Common Pleas Court.   By entry of court on agreement of counsel they have been consolidated for the purpose of this appeal.

The plaintiff, appellee herein, will be referred to as the state.

The contempt charged is that the defendants, after having been duly sworn as witnesses before a duly constituted session of the Un-American Activities Commission, refused to testify in response to certain questions propounded to them.

It is charged that defendant Stern refused to answer two questions, defendant Brown four questions, and defendant Raley 16 questions.   Each refusal was charged as a separate offense.

The defendants waived their right to a jury and elected to be tried by a judge of the court in which the indictments were pending.

After motions to quash, pleas in abatement, and demurrers had been overruled, the trial proceeded, and at its conclusion

the court found the defendants guilty as charged and sentenced each to imprisonment in jail for 10 days and to pay a fine of $500 on each count, the prison sentences, however, running concurrently, and the fines, other than the first one, being remitted.

The motions to quash, the pleas in abatement, and the demurrers raised substantially the same questions. They attacked the constitutionality of Section 103.31 *et seq.,* Revised Code, under which the Un-American Activities Commission assumed to act, denied the legal existence of such commission, and then assailed the right of the commission generally, and, in particular, the right of the commission to require the defendants to answer the questions upon which the indictments were based, against the defendants' claims of privilege from answering under Section 10, Article I of the Constitution of Ohio and the Fifth and Fourteenth Amendments to the Constitution of the United States.

That the General Assembly, both by implication from the grant of power to legislate and by express constitutional grant (Section 8, Article II), has power to ''obtain, through committees or otherwise, information affecting legislative action under consideration or in contemplation,'' is too clear for debate. And, when the enabling act is in the form of a law approved by the Governor, or passed over his veto, and the subject matter about which the information is sought comes within the legislative power of the state, its validity is doubly clear.

Of course, where the enabling act provides for the appointment by the General Assembly of a committee or commission composed of its members, the authority of the members of such committee or commission would necessarily expire on the termination of their legislative term. The General Assembly is denied appointive power by the Constitution except in a few specified exceptions (Section 27, Article II). One of the exceptions is the power given it to appoint its own officers, including, of course, committees of its own members, but, as already stated, these appointments can not be for a longer life than that of the appointing power. The qualification to serve on a committee or commission is conditioned upon continued membership in the General Assembly.

It is claimed that as the General Assembly had adjourned

sine die before the hearing at which the defendants were questioned, the authority of the commission had expired. We do not think that is the test of the duration of the commission's authority. We are of the opinion that the commission's life was limited only by the length of the term for which its members were elected to the General Assembly, subject, of course, to the repeal of the law in the meantime. We are of the opinion also that the law does purport to confer authority beyond the adjournment sine die of the General Assembly, but does not assume to confer any authority beyond the term for which the members of the commission were elected. It is true that the law required the filing of the commission's entire file with the Clerk of the Senate on January 31, 1954, and the filing of its report and recommendations with the 100th General Assembly and the Governor on that date; but that was no more than a winding up of its affairs and the delivery of the state's property in its possession to the designated state officials. It's little more than would be implied as a duty on expiration of the term to surrender the office and its accessories to the successor or official entitled thereto.

It should be noted that the commission was created by a law, as distinguished from a legislative resolution. This law authorized the commission to report from time to time to the General Assembly, to the people, and to the Governor, and to complete its work so that it could make its final report on January 31, 1954. This final report was to be made not only to the 100th General Assembly, but also to the Governor, which would be during the term of the Governor who approved the law. The fact that the commission was created by law which expressly provided for its continuance after adjournment distinguishes this case from the cases relied on by the defendants. We assume that the power of appointment to the committee of members of the Legislature would expire at the end of their legislative terms, except for the purpose of winding up the affairs of the committee by delivering its file to the proper custodian.

In 81 Corpus Juris Secundum, 958, 959, Section 42, it is said:

"While legislative committees, in the absence of special authority, can act only while the Legislature is in session, it is

within the power of the Legislature *as a whole,* in the absence of constitutional restriction, to appoint committees to sit after adjournment, or during a recess.'' (Emphasis added.)

In the text, at page 959, it is said also:

''Generally, neither branch of the Legislature may, by independent action, create an investigating committee with power to sit after adjournment of the Legislature, and, in order to continue or appoint a committee whose work of investigation is to proceed after the adjournment of the body which created it, the enactment of a law by bill passed in the manner prescribed by the constitution, is required in some jurisdictions.''

See, also, *Swing* v. *Riley,* 13 Cal. (2d), 513, 90 P. (2d), 313.

A law, of course, continues operative indefinitely, or until it expires by express limitation or repeal. A resolution by one branch of the Legislature, or even by both, differs from a law in this respect. This distinction represents the difference between the authorities relied on by counsel for defendants and the case at bar.

Defendants' counsel rely on *State, ex rel. Rulison, Pros. Atty.,* v. *Gayman,* 11 C. C. (N. S.), 257, 21 C. D., 59 (affirmed without opinion in 79 Ohio St., 444, 87 N. E., 1136), and 2 Opinions of Attorney General (1935) 1041, No. 4557. We believe they are inapplicable. In both instances, the question related to the power after adjournment sine die of committees appointed by resolution of either one or both houses of the Legislature. Neither related to a committee appointed in pursuance to the terms of a law, as in the case at bar.

Thus, we conclude that the adjournment sine die of the General Assembly had no effect upon the power of the Un-American Activities Commission created by the joint action of all branches of the law making agencies of the state.

But it is asserted that the act of the Legislature creating the Un-American Activities Commission invaded a field of government in which the United States government has paramount authority under the Constitution of the United States; that the United States had already rightfully occupied the field by the enactment of the so-called Smith Act (Title 18, Section 2385, U. S. Code), and, perhaps, other laws; and that the act of the Legislature creating the Un-American Activities Commission

authorized investigations not exclusively for the purposes of the General Assembly but for other purposes, including agencies of the United States government.

To properly discuss this assertion, it is necessary to set forth Section 103.34, Revised Code, in which power was conferred upon the commission. That section provides:

"The Un-American Activities Commission shall:

"(A) Investigate, study, and analyze:

"(1) All facts relating to the activities of persons, groups, and organizations whose membership includes persons who have as their objective or may be suspected of having as their objective the overthrow or reform of our constitutional governments by fraud, force, violence, or other unlawful means;

"(2) All facts concerning persons, groups, and organizations, known to be or suspected of being dominated by or giving allegiance to a foreign power or whose activities might adversely affect the contribution of this state to the national defense, the safety and security of this state, the functioning of any agency of the state or national government, or the industrial potential of this state;

"(3) The operation and effect of the laws of this state, of the several other states, and of the United States, which purport to outlaw and control the activities enumerated in this section and to recommend such additional legislation or revision of existing laws as may seem advisable and necessary;

"(B) Maintain a liaison with any agency of the federal, state, or local governments in devising and promoting means of disclosing those persons and groups who seek to alter or destroy the government of this state or of the United States by force, violence, intimidation, sabotage, or threats of the same.

"The commission shall have such additional rights, duties, and powers as are necessary to enable it fully to exercise those specifically set forth in this section and to accomplish its lawful objectives and purposes."

In the first place it is contended by defendants' counsel that this law attempts to confer power to invade the national domain. They point out that the Un-American Activities Commission is authorized by this law to investigate, study and analyze all activities having as their objective the overthrow or re-

form "of our constitutional *governments* by fraud, force, violence, or other unlawful means," activities which might adversely affect Ohio's contribution to the national defense, the safety of the state, the functioning of any agency of the state or national government, the operation and effect of the laws of this and other states and of the United States on the subject; and to maintain a liaison with agencies for the purpose of devising means of disclosing persons and groups who seek to overthrow the government of either the United States or this state by force and violence. The purpose is stated to be to furnish the basis for recommending such additional legislation as might be found advisable and necessary.

It is said that sedition and treason against the United States are matters within the jurisdiction of the United States and beyond the jurisdiction of the individual states. We think it is also implied that there is no such thing as sedition or treason against an individual state. We cannot agree with either of these claims. Sedition and treason against the United States as a sovereign entity are necessarily offenses also against every sovereign state of the federal Union. Their relation to one another is fixed by the United States Constitution, which, by its terms, makes the United States government, within its domain, paramount. However, it leaves the states paramount sovereigns in all governmental matters not transferred to the United States government. It does not create hostile sovereignties, or sovereignties joined together in a loose confederacy. It creates "an indestructible Union, composed of indestructible states." While each should be on guard to protect its own domain, it should be equally on guard to see that the others should be secure in their respective domains.

The United States Constitution contains many provisions emphasizing the spirit of friendship, co-operation and comity which it created among the states. And many laws of the United States as well as of the individual states have been passed to implement this spirit of co-operation for the common good. Speaking of this spirit of comity, Chief Justice Taft said, in *Ponzi* v. *Fessenden,* 258 U. S., 254, at 259, 66 L. Ed., 607, 42 S. Ct., 309, 22 A. L. R., 879, that:

"We live in the jurisdiction of two sovereignties, each

having its own system of courts to declare and enforce its laws in common territory. It would be impossible for such courts to fulfil their respective functions without embarrassing conflict unless rules were adopted by them to avoid it. The people for whose benefit these two systems are maintained are deeply interested that each system shall be effective and unhindered in its vindication of its laws.''

It is said that, assuming that it is appropriate for state governments to co-operate with other states of the United States without surrendering any of their sovereign powers, such co-operation cannot be accomplished through their legislative department. That, it seems to us, depends on the nature of the subject matter and purpose of the co-operation. If the subject matter is legislation and the purpose is to provide information as a base for legislation, it is entirely appropriate for the state to be represented through an agency of the General Assembly in the co-operative effort. And that was the purpose of the co-operation proposed by this legislation. On the basis of its investigation, the commission was charged with the duty of recommending such additional laws as it might deem necessary or advisable.

That sedition and treason are proper subjects of state action, there can be no doubt. This is recognized in Section 2, Article IV of the United States Constitution, wherein it is provided that ''a person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state,'' shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime. While treason against the United States is necessarily treason against every state as well, the reverse is not true. Treason against a state is not necessarily treason against the United States. There have not been many recent instances of trials for treason or sedition against an individual state of the United States, but there were frequent instances in the early history of this country. The most renowned one was the trial and conviction of Thomas W. Dorr by a court of the state of Rhode Island, about 1841. When Rhode Island declared its independence of Great Britain and became one of the United States, it chose to continue the char-

ter granted to it by Charles II in 1660 as its fundamental law. One of its provisions limited the right to vote to those owning property of a substantial amount. The charter contained no provision for its amendment. Dorr and his followers agitated for a new constitution containing a broadening of the base of franchise. The established government refused to take any action to call a constitutional convention. This led to violence, and Dorr and his associates called a popular convention, which adopted a constitution for the state, and then made an unsuccessful attempt to seize the state arsenal. This became known as Dorr's Rebellion. After the rebellion was put down, Dorr was indicted for treason in the state court, found guilty and sentenced to life imprisonment. An effort was made to invoke the jurisdiction of the United States Supreme Court to review his conviction, but the effort failed. *Ex Parte Dorr,* 44 U. S. (3 How.), 103, 11 L. Ed., 514. Neither in that case nor in the subsequent case of *Luther* v. *Borden,* 48 U. S. (7 How.), 1, 12 L. Ed., 581, growing out of the same rebellion, did the United States Supreme Court say or intimate that Rhode Island had acted beyond its jurisdiction.

In 52 American Jurisprudence, 801, Section 12, it is said:

"Treason by levying war against a state has been held not necessarily treason against the federal government; but if the intention is to subvert the state government and then withdraw it from the Union, this would constitute levying war against the United States."

Counsel rely on the recent case of *Commonwealth* v. *Nelson,* 377 Pa., 58, 104 A. (2d), 133, which held that as Congress had passed the Smith Act, *supra,* on the subject of sedition, it had thereby impliedly pre-empted the field and excluded the state from legislating on the same subject. Consequently, it declared the Pennsylvania Sedition Act was suspended. In reaching this conclusion, the court relied strongly upon *Hines, Secy.,* v. *Davidowitz,* 312 U. S., 52, 85 L. Ed., 581, 61 S. Ct., 399, in which the United States Supreme Court declared the Pennsylvania Alien Registration Act unconstitutional. One of the judges in *Commonwealth* v. *Nelson, supra,* dissented and pointed out the difference between the grant of power over external affairs by the United States Constitution and the grant of power over in-

ternal affairs. In external affairs there is no competing sovereignty with which power must be divided, whereas, in internal affairs, all power, not granted, is reserved to the states or to the people thereof. At page 101, the dissenting judge said:

"A reading of the majority opinion [*Hines* v. *Davidowitz*] makes it clear that the basis for the decision was the court's conviction that a State Alien Registration Act would likely involve us in grave international controversies and might even lead to war. No such result could possibly ensue from state treason or sedition laws * * *."

The authority of *Commonwealth* v. *Nelson, supra,* is weakened by the fact that since the case at bar was submitted the Supreme Court of the United States, in response to the petition of the Attorney Generals of 25 states, has granted a writ of certiorari and the case is now pending in that court for review.

Furthermore, we do not think *Commonwealth* v. *Nelson, supra,* is applicable in any way to the facts of this case. That case involved the state's sedition act—a penal act—defining a crime and prescribing punishment. We are not confronted with a penal statute in the case at bar. The statute here under consideration is not primarily a penal statute of any sort. It is a law creating a legislative commission with power to investigate and make a report of its findings and conclusions on subjects coming within the reserved power of the state.

Next, it is urged that the act attempts to confer judicial power upon the Un-American Activities Commission, in that it authorizes co-operation or liaison with all departments of government, both state and federal, and confers judicial power in the provision relating to contempt. It is also pointed out that the proceeding by indictment is not authorized by the law.

We find there is no attempt to confer judicial power upon the Un-American Activities Commission. None of the powers referred to is exclusively judicial.

The fact that the Legislature referred to existing statutes on the subject of contempt in specifying what acts were punishable as contempts does not confer judicial power, notwithstanding the statutes referred to deal with contempt of courts. Furthermore, we are not required in this case to refer to Section 12137, General Code, for the reason that Section 103.35, Re-

vised Code, expressly and specifically makes "refusal of any person or officer to testify" a contempt of the commission.

Nor do we think the provision invalid which directs that contempt proceedings should be in accordance with Sections 2705.03 to 2705.09, inclusive, Revised Code. Those sections provide for a written charge, an entry thereof on the journal, opportunity to be heard in person or by counsel and a trial before the court with opportunity to make any defense the accused may have. All this was accorded the defendants. The fact that the charge took the form of an indictment, it seems to us, is immaterial. Instead of omitting anything designed to protect the accused, it gave them a mantle of protection to which, perhaps, they were not entitled. Undoubtedly, contempt of the Un-American Activities Commission is an affront to the dignity of the state of Ohio, punishable by a fine of not more than $500 or imprisonment for not more than 10 days, or both. Section 2705.05, Revised Code. It is, therefore, a misdemeanor. By Section 2941.35, Revised Code, misdemeanors may be prosecuted on information sworn to by the prosecuting attorney, but that is permissive, and the prosecution may be instituted by indictment.

On this phase of the case, it is our conclusion that the law creating the Un-American Activities Commission is a constitutional exercise of power by the Legislature and that the power conferred upon it had not expired at the time it held the meetings at which the defendants were called upon to testify.

Perhaps we should notice the contention that the defendants would not be in contempt in any event, because they were not ordered to answer after their claim of privilege. It seems to us that the wording of Section 103.35, Revised Code, is sufficient answer to this contention. It expressly makes "refusal" to answer any question on any subject concerning which a witness "may be lawfully interrogated" a contempt. The observance of no particular ritual need be pursued in order to place the witness in contempt. The only requirement is that it be made to appear that he knowingly, deliberately and with full knowledge of the consequences refused to testify. The question is whether this record shows a deliberate refusal with full knowledge of the consequences.

But it is urged that the defendants were excused from answering by the constitutional provisions—state and federal—providing that no person shall be required to be a witness against himself in any criminal case or be required to testify before any governmental tribunal to any matter that might tend to incriminate him. That claim requires an examination of the question propounded in the light of all the surrounding circumstances. And what were the circumstances? The only significant circumstance was that the Un-American Activities Commission was created to ascertain whether there existed in Ohio any evidence of treason, sedition or any other acts having for their object the subversion of government by force and violence, and thereafter to report what it had found with its recommendations as to what, if any, legislation was necessary or advisable. A witness called before it would naturally take cognizance of that purpose. Such a person would have no right, however, to conclude that the purpose of the commission was to entrap him into confessing a crime or into giving evidence having a tendency to incriminate him, and to act as though that was the purpose. It was not a grand jury seeking evidence upon which to base an indictment. Properly viewed, it presents the aspect of an impersonal inquiry to elicit facts as to the actual state of the social order and not to secure evidence to support a predetermined conclusion, or to discredit anyone.

And in determining whether the claim of privilege was justified, we must bear in mind that the mere claim of privilege cannot be regarded as a defiance of the law or the commission, and it must also be remembered that at the time of this hearing mere membership in the Communist Party had not been made a crime, either by the state of Ohio or by the United States of America. The Communist Party had not been outlawed. However, the Smith Act of Congress, making sedition a crime, and the Ohio statute making syndicalism, that is, advocacy of force, violence and terrorism as a means of effecting political or economic change, a crime, were in force.

Before considering the claim of privilege from testifying under the provisions of the Fifth and Fourteenth Amendments to the Constitution of the United States and Section 10, Article I of the Constitution of Ohio, it is necessary to revert to the

contention of appellants that after they claimed the privilege they were not ordered to answer and that, until there is a refusal to testify after being ordered to do so, no contempt has been shown, or, at least, it is asserted that the commission appeared to accept the claim of privilege; and that the mere claim of privilege cannot be used as a basis for contempt, and that that is all this record shows.

We agree that the record must show contumacious conduct on the part of the witness, but we do not agree that the law requires that state of willful resistance to be disclosed by an exclusive ritual.

The United States Court of Appeals for the District of Columbia has made an exhaustive study of this question in three cases pending before it at the same time. There were lengthy principal, concurring and dissenting opinions in each case, but upon the question with which we are concerned there was no disagreement as to the correct rule. The disagreement related to its application to the facts and to other questions foreign to our problem.

In *Quinn* v. *United States*, 203 F. (2d), 20, Quinn was asked whether he was or ever had been a member of the Communist Party, to which, instead of making a direct answer, he referred to a statement made by a former witness and stated that he took the same position. There was a question of whether the statement of the former witness was an adequate claim of privilege, but upon the question of the duty of the tribunal, upon an assertion of the constitutional right to refuse to testify to incriminating circumstances, Judge Bazelon, in a concurring opinion, at page 33, said:

"Although there is no talismanic formula which the committee must use in directing the witness to answer, I would state the principle this way: It must appear from all the circumstances that (1) the witness was clearly apprised, and not left to the risk of guessing upon pain of criminal penalties, whether the grounds for his objection to answering were accepted or rejected, and that (2) if rejected, he was given another opportunity to answer. Under this view the committee would necessarily have to inform the witness *in time* to allow opportunity for answering. I think it implicit in Bart [case]

that the ruling must be that of the inquiring authority (the committee here). The court there says that '[i]f the actual questioner be counsel instead of the inquiring authority, or a member of it, the attitude * * * of that authority may be made clear by prior announcement or by acquiescence or ratification. That phase of the matter must be determined from the circumstances.' I take this to mean that it must clearly appear to a reasonable person in the position of the witness that the ruling is, in fact, that of the inquiring authority or its duly authorized presiding member acting on its behalf.''

In *Bart* v. *United States,* 203 F. (2d), 45, Bart was indicted for refusal to state what his name was when he came to the United States, what his father's name was, under what name his father became a citizen of the United States, and what his father's name was before he changed it. The basis of the refusal to answer was that the questions were not pertinent to the inquiry that the congressional Un-American Activities Committee was authorized to conduct, but that ground was abandoned upon oral argument to the court, and reliance was placed upon the claim that Bart was not in contempt because the committee had not ordered him to answer. The court rejected this contention, saying at page 48 that:

''We have held in *Emspak* v. *United States,* 91 U. S. App. D. C., 378, 203 F. (2d), 54, decided today, that there is no requirement that a specific direction to answer he given after a refusal to answer. Emspak's contention was directed to the necessity for a specific direction to answer after an asserted claim of the privilege against self-incrimination. It was clear upon the record, certainly as to some of the questions, that Emspak was made indisputably aware of the attitude of the subcommittee toward his refusals and his grounds for the refusals; indeed his counsel made no contrary contention in that respect. In the present case the basic problem recurs in a different framework. For that reason we add to the discussion in the *Emspak case.*''

In *Emspak* v. *United States,* 203 F. (2d), 54, referred to above, four of the judges, speaking through Clark, J., held that Emspak had not claimed the Fifth Amendment as a shield in his refusal to answer, but, conversely, that his refusal to an-

swer was his method of protecting the integrity of that amendment. Other judges, speaking through Prettyman, Circuit Judge, did not rely upon that interpretation of Emspak's language. They assumed that he had claimed his privilege against incrimination. At page 60, they said:

"In respect to the applicable requirements upon a witness's refusal to answer a question, we add one further observation in view of the decision and opinion in *Quinn* v. *United States,* 91 U. S. App. D. C., 344, 203 F. (2d), 20, decided today. We there remand; we here affirm. But we remand there because the trial court erroneously, we think, held specifically that the defense offered by Quinn was not available to him as a matter of law. Reversal upon that ruling required a new trial. We made further observations designed to be helpful upon the trial thus required. In the present case there was no corresponding ruling of law. There was a general judgment of guilty by the judge without a jury. Our review upon the point is limited to a determination whether the record contains sufficient evidence to support a finding that Emspak deliberately and intentionally refused to answer and thus to support that judgment. We find that it does. The evidence is ample that Emspak was made well aware that the subcommittee desired answers to its questions despite the grounds he advanced for refusing. Hence we affirm."

This issue requires an examination of this record to determine what it shows upon the subject of whether it was made clear to each defendant that the Un-American Activities Commission required an answer, notwithstanding the claim of privilege. We will consider first the record as to defendant Raley.

The record shows that in response to a subpoena, Raley appeared with his attorney, who identified himself and proffered and was allowed to file a nine page brief or protest on behalf of defendants Talmadge Raley, Joseph Stern and Renel Stanfield, all members of the United Electrical, Radio and Machine Workers of America, in which the legal existence of the Un-American Activities Commission was challenged and all its activities declared to be without authority of law and null and void. However, expressly reserving their rights, they consented to testify, but did not waive the privilege to claim exemption from self-

incrimination. Raley, having been sworn, took the stand. According to defendants' brief, he was asked about 209 questions. He answered 76 and asserted his privilege of declining to answer 133. For the most part, his examination was conducted by counsel for the commission. His answers disclose that he was a native of Kentucky, had been a resident of Ohio for 31 years, had attended grammar school, and later Miller's Business College at night for a short time, and had received instruction in the technical training school while serving for about two years in the United States Air Force. He had had various employments and became a member of United Electrical, Radio and Machine Workers of America, later becoming business agent for a local and organizer for the union. His answers disclosed also that he had been a witness before a committee of Congress and had, at that time, exercised his privilege of refusing to answer self-incriminating questions. There is no doubt that he knew and was keenly aware of his rights in that respect. His examination shows he was on guard at all times.

In the first count of the indictment, Raley is charged with refusal to answer the following question:

"Q. Now, Mr. Raley, as an official of the United Electrical Workers, is there any concern among the officials of the possible presence of Communist Party members among the leadership of the UE?"

This question was asked by counsel for the commission, and the defendant, in response, said:

"A. I must assert the privilege of the Fifth Amendment of the Constitution and Article I, Section 10, of the Ohio Constitution, and refuse to answer."

Neither the chairman nor any other member of the commission indicated in any way that an answer was insisted upon. Under such circumstances, we cannot say that there is proof that Raley was a contumacious witness. We hold that the court erred in finding him guilty on this count.

In the second count, Raley is charged with refusal to answer this question, "Now as a matter of fact Victor Decavitch was formerly district president of the UE, was he not?" To this question, asked by counsel for the commission, Raley responded by saying, "Again, I have to assert my privilege un-

der the Fifth Amendment to the United States Constitution, and Article I, Section 10 of the Constitution of the State of Ohio." Thereupon, the chairman of the commission proceeded to question him concerning the basis of his belief as to how any answer could incriminate him, but the witness claimed the privilege and refused to answer any such questions. Finally, the chairman of the commission asked, "You refuse to answer the question?," and Raley responded, "On the basis of my privilege as granted by those documents." This situation suggests two questions—was the refusal to answer a knowing and deliberate refusal to answer the chairman, and could any conceivable responsive answer have any possible tendency to incriminate the witness? As to the first question, we are of the opinion that the witness understood that the commission insisted upon an answer, notwithstanding his claim of privilege, and that the refusal was deliberate and with full knowledge of the consequences. We are of the opinion also that Raley's knowledge that Decavitch had been district president of such union could have no possible tendency to incriminate him. It is not suggested that mere membership in the union or holding a position or office in it was unlawful. The most that is conceivable is that it might furnish the opportunity for the commission of some crime. For greater reason, mere knowledge that Decavitch had held an office in that organization could have no tendency to prove the commission of any crime by the person having such knowledge. If the claim of privilege should be given such a broad application, it would cease to be a limited privilege from testifying in certain respects and become an absolute and complete exemption from taking the witness stand. Interrogation would be futile.

In 58 American Jurisprudence, 57, Sections 59 and 60, it is said:

"Questions as to a witness' presence are deemed merely as preliminary, unless the place mentioned in the question is a public nuisance, and do not entitle the witness to exercise the privilege of silence. So also, a witness may be required to answer a question whether he saw the commission of a crime, which does not involve his connection with the acts done, or require him to divulge why he saw the crime, if he did see it. It

is ruled in some jurisdictions that a party engaged in an unlawful transaction cannot be compelled to disclose the names of others concerned therein, while elsewhere, under similar circumstances, a directly opposite conclusion is reached.

"Statements by a witness concerning a fact which is not a part of a criminal transaction, but is material in a prosecution based on such a transaction, as giving his name, declaring his presence in some locality remote from the scene of crime, or stating whether he was, in fact, a public official at the time it is claimed the offense was committed, do not in themselves constitute incriminating statements tending to show him guilty of crime, although on a prosecution for some offense it may develop that they are material."

We hold that the trial court did not err in finding Raley guilty on such charge.

In the third count, Raley was charged with refusing to answer the question, "Now as a matter of fact that was the headquarters of Local 766 of the UE at that time; isn't that correct?" The record shows that after his refusal to answer this question, asked by the commission's counsel, on the ground of privilege, the chairman of the commission asked him how an answer to that question could possibly tend to incriminate him, and he again refused to answer, asserting his privilege. Thereupon, the chairman said, "I, nevertheless, request an answer." Raley, after consulting his counsel, again refused to answer. So it seems to us that his refusal was deliberate and with full knowledge. We are further of the opinion that knowledge of the place where the headquarters were could have no tendency to incriminate. If membership in that union was not a crime, mere knowledge of certain facts concerning its activities could not be regarded as an element of any conceivable crime.

We are of the opinion that the court did not err in finding the defendant guilty on the third count of the indictment.

What we have said concerning the first count is equally applicable to the fourth count. There was nothing indicating that the commission demanded an answer to the question propounded by its counsel. We are, therefore, of the opinion that the court erred in finding Raley guilty on the fourth count.

In the fifth, sixth and seventh counts of the indictment,

Raley was charged with refusing to answer whether he knew Herbert Hirschberg, Joseph Sheets and John Thomas. The record shows that counsel for the commission asked these questions, and that neither the chairman nor any member of the commission indicated in any way that an answer was expected. We, therefore, hold the court erred in finding Raley guilty on these charges.

In the eighth count, Raley was charged with contempt for refusing to answer the question, "As a matter of fact every one of these individuals are leaders of UE or were leaders of UE at that time, were they not, Mr. Raley?" The individuals referred to were Hirschberg, Sheets and Thomas. In our opinion, the proof was deficient in the same respect as we have found it to be in connection with the fifth, sixth and seventh counts. For that reason, we find that the court erred in finding Raley guilty on the eighth count.

In the ninth count, Raley was charged with contempt for refusing to answer the question, "Let me refer to an article carried in the Cincinnati Post on September 13th, 1949, headed 'Schools Trace Communist Propaganda. Union Agent Denies Kits Are Leftist' and [which] refers to an interview with you. Do you recall that interview?" The record shows that after Raley's refusal to answer, the chairman of the commission informed him that the commission expected an answer, and that it was his (the chairman's) opinion that there was no valid ground for his refusal. Raley consulted with his counsel, who expressed a contrary opinion, which Raley chose to follow. We think this is an instance of a deliberate defiance of the commission, with full knowledge. The question remains whether any conceivable responsive answer could tend in any way to incriminate the witness. We are of the opinion that it could not.

The refusal to answer questions as to whether Raley knew Jerome Joseph, Victor Pasche, Herbert Siens, Marie Reed Haug or Paul Shepherd furnished the basis for the charges of contempt in the tenth, eleventh, twelfth, thirteenth and fourteenth counts of the indictment.

Those questions were asked by a member of the commission, so that in our opinion the commission must be considered as expecting and demanding answers thereto. And, for the

reasons already stated, we are of the opinion that the mere knowing of one or more or all these named persons cannot be regarded as having any tendency to incriminate.

For these reasons, we are of the opinion that the court did not err in finding the defendant Raley guilty as charged in such counts.

And, for the same reasons, the court is of the opinion that the court did not err in finding the defendant guilty on the fifteenth count, charging him with refusing to answer whether all of the aforesaid persons were not prominent members of the union in Cleveland, Ohio.

In the sixteenth count, Raley was charged with contempt for refusing to answer the question propounded by a member of the commission, "Who has a similar—holds your position in the Cleveland area at the present time with the union?"

For the reasons already given, we are of the opinion that an answer was required to this question, and that the claim of privilege from self-incrimination was no protection.

We, therefore, affirm the judgment against Raley on counts 2, 3, 9, 10, 11, 12, 13, 14, 15 and 16, and reverse the judgment as to the other counts.

We will now consider the record as it relates to Joseph Stern. He was asked 105 questions and refused to answer 60. He was indicted for refusing to answer two.

In the first count, he was charged with refusing to answer the question, "Where do you reside, Mr. Stern?" This question was propounded by counsel for the commission, and, after the witness refused to answer, the chairman, at the request of counsel, ordered the witness to answer; so that unless the claim of privilege is valid, the deliberate refusal to obey the order must be held to be a contempt. The question remains as to whether any reasonable person could conclude that any conceivable responsive answer would tend to incriminate the witness. It is admitted that under ordinary circumstances residence would not be regarded as containing any suggestion of a crime or any element thereof; still it is contended that later questions disclosed that the questioner's purpose eventually was to prove that a Communist meeting was held at the residence of the defendant and that he was present.

We believe counsel fail to distinguish between the elements of crime and opportunity to commit crime. There is no suggestion that the defendant's residence at a particular place would be an element in any crime with which he might be charged. Even proof of his presence at a particular place would at most be evidence only of opportunity to commit the crime. It should be observed that at the time here involved membership in the Communist Party had not been made a crime.

We are of opinion that the trial court did not err in finding Stern guilty as charged in the first count of the indictment.

In the second count, Stern was charged with the refusal to answer the question, "I ask you if it is not a fact that Frank Hashmall assigned you to work in the Progressive Party in this county?" This question was asked by counsel for the commission, and there is nothing to indicate that the commission required an answer.

We, therefore, conclude that the court erred in finding the defendant guilty on such charge.

Turning now to the charges against the defendant Emmett Calvin Brown, we find that in the first count he is charged with refusing to answer the question, "And what has been your educational background?"

The defendant did not invoke the Constitution of the United States or Section 10, Article I of the Constitution of the State of Ohio as the basis for his refusal to answer such question. The ground of his refusal was, "I just don't think it is your business." He was told by the chairman that the commission would decide that question. The chairman then proceeded to ask, "Do I understand, for the record, you are refusing to answer the question because you feel it is not our business?," to which the defendant responded, "The answer is the same."

It seems to us that the defendant, as a person of average intelligence, which he was, would understand from the remarks of the chairman that he approved of the question propounded by counsel for the commission and expected the defendant to answer it. By not basing his refusal to answer on exemption from self-incrimination, Brown waived that ground, and his right to refuse to answer must be judged by the ground assigned

by him. As to the ground so assigned, we hold that the question was relevant to the purpose for which the Un-American Activities Commission was created, and, therefore, the reason given was not a valid ground for refusal to answer. If the privilege against self-incrimination had been assigned, it would not have availed as a shield. It seems to us that the question is no more than one of the customary questions asked of witnesses for the purpose of developing facts so that the trier of the facts could determine what credibility to attach to his testimony, and that it was not asked for any other purpose. We are of the opinion that an answer was relevant to the investigation which the Un-American Activities Commission was authorized to conduct. Until the general environment and qualifications of the witness had been established there could be no adequate basis upon which to determine the credibility to be attached to the witness' testimony.

We find that the court did not err in finding the defendant guilty on such count.

In the second count, Brown was charged with contempt for refusing to answer the question, "Mr. Brown, were you ever employed by the Fisher body plant at Norwood, Ohio?," and in the third count for refusing to answer the question, "Is there anything about being employed at that plant which might tend to incriminate you?"

These questions were propounded by the chairman of the commission.

We are of the opinion that the answer would have no tendency to incriminate, and that, therefore, the court did not err in finding Brown guilty on both counts.

The fourth count is based on a question of the chairman of the commission. He asked, "Were you active in 1947 in the election in the city of Cincinnati in supporting any candidate or any issue on the ballot in that election?" In answer to this question, Brown said, "I invoke the privilege of the Fifth Amendment."

We fail to see in what respect the Fifth Amendment in and of itself furnishes any shield to the defendant. The Fifth Amendment is a limitation on the power of the government of the United States alone. We do not stop to consider what of

its provisions are incorporated in the Fourteenth Amendment, which is a limitation on the power of the states, because we are of the opinion that there is no provision in either the Constitution of the United States or the Constitution of the State of Ohio that would be applicable to this situation, for the reason that any answer that would be given could disclose nothing other than the right of every citizen to participate in public affairs.

The contention suggests that open political activity is, of itself, something concerning which no inquiry is permitted, and that this sanctity somehow flows from the secret-ballot law. There is no doubt that the law insures to a citizen the right to mark his ballot, without molestation, in the secrecy of the voting booth, and that he can not be questioned concerning how he voted; but it is an entirely different thing to openly engage in political activities outside of the voting booth. There is no more exemption from investigation of that activity than of any other.

We find the court did not err in finding Brown guilty on such count.

It was claimed by the state that the defendants had no occasion to claim the right to refrain from giving incriminating testimony, because of the immunity from prosecution granted by Section 101.44, Revised Code. It is true that it is enacted by that section that the testimony given before a *committee* of the General Assembly should not be used in any criminal prosecution against the witness and that he cannot be prosecuted on account of any transaction or matter concerning which he testifies. We have already indicated that in our opinion, because the members of this commission were also members of the General Assembly, their terms as members of the commission expired when their terms in the General Assembly expired. It is also true that the purpose of the commission was to collect facts to furnish a basis for legislation, and only incidentally were the fruits of its investigation available to the other departments of the government. The authority and power of the commission was based on a law and not merely on a resolution of the General Assembly. The immunity section (Section 101. 44, Revised Code) by its terms is limited to testimony given be-

fore a committee or sub-committee of the General Assembly. However, we are of the opinion that the commission must be regarded as a legislative investigating body, notwithstanding its name and the manner of its creation. We are, therefore, of the opinion that Section 101.44, Revised Code, is applicable to proceedings before the commission and confers immunity to the limits of the state's power. The fact that the immunity would be no shield from prosecution by other sovereignties, such as another state or the United States, is the basis for no valid objection to the operation of the immunity within the sovereignty granting it. 58 American Jurisprudence, 75, Section 89.

It is also urged that Section 101.44, Revised Code, must be read in relation to Section 101.41, Revised Code, and that so read the Un-American Activities Commission does not come within its terms, inasmuch as it is neither a standing nor a select committee. We do not stop to consider whether it could be brought within the definition of those terms, for the reason that the two sections relate to entirely different matters and Section 101.44 contains no such limitation, and, therefore, the terms of one cannot be used to limit the terms of the other.

It is urged also that the defendants were misled by the assurances of the chairman of the commission that they had the right to claim the privilege of refusing to give self-incriminatory testimony. We fail to see how the defendants could have been misled by such assurance into surrendering a right, if, as a matter of law, they had no right to surrender.

Without resort to the immunity extended by Section 101.44, Revised Code, we find that each of the defendants was properly convicted on one or more counts. However, even assuming the applicability of the immunity statute, the state still had the burden of proving that the refusal to answer was the deliberate act of the defendant, with knowledge of the consequences, in order to give the act the character of contumacy essential to a conviction for contempt.

For these reasons, the conviction of Talmadge Raley is affirmed as to counts 2, 3, 9, 10, 11, 12, 13, 14, 15 and 16, and reversed as to all other counts. The conviction of Joseph Stern is affirmed as to the first count, and reversed as to all other

counts. The conviction of Emmett Calvin Brown is affirmed as to all counts.

*Judgments accordingly.*

HILDEBRANT, J., concurs.

Ross, J., concurs as to all affirmances, but dissents from all reversals.