# RALEY ET AL. *v.* OHIO.

No. 175.   Argued April 22–23, 1959.—Decided June 22, 1959.*

*Morse. Johnson* argued the cause and filed a brief for appellants in No. 175..

*Thelma C. Furry* and *Ann Fagan Ginger* argued the cause and filed a brief for appellant in No. 463.

---

*Together with No. 463, *Morgan* v. *Ohio,* also on appeal from the same Court, argued April 23, 1959.

*C. Watson Hover* and *Carl B. Rubin* argued the cause and filed a brief for appellee in No. 175.

*Earl W. Allison* argued the cause and filed a brief for appellee in No. 463.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

These two appeals involve convictions of four appellants for refusal to answer certain questions put to them at sessions of the "Un-American Activities Commission" of the State of Ohio, established in the legislative branch of the Ohio Government.[1] The appellants had claimed the privilege against self-incrimination in refusing to answer each of the questions. The cases are before us for the second time; on prior appeals the judgments below were vacated and the causes remanded for reconsideration in the light of *Sweezy* v. *New Hampshire,* 354 U. S. 234, and *Watkins* v. *United States,* 354 U. S. 178. See 354 U. S. 929. The remand resulted in a reaffirmance of the prior judgment without discussion, 167 Ohio St. 295, 147 N. E. 2d 847, and on the present appeals we postponed

---

[1] The three appellants in No. 175, Raley, Stern, and Brown, were convicted in a joint trial in a different Common Pleas Court from the one in which appellant in No. 463, Mrs. Morgan, was convicted. The judgments as to Raley, Stern, and Brown were affirmed in the Court of Appeals for Hamilton County, 100 Ohio App. 75, 136 N. E. 2d 295, and that of Mrs. Morgan in the Court of Appeals for Franklin County. The cases were decided by the Ohio Supreme Court in a single opinion, 164 Ohio St. 529, 133 N. E. 2d 104, which affirmed the convictions.

Raley, Stern, and Brown were convicted under the then applicable provisions of Ohio General Code § 12137, which provided that "a failure . . . to answer as a witness, when lawfully required" may be punished "as . . . for a contempt." Mrs. Morgan was convicted under Ohio General Code § 12845, which punished those, summoned before a Committee of the State Legislature, who refuse "to answer a question pertinent to the matter under inquiry."

further consideration of the jurisdictional questions presented until the arguments on the merits. 358 U. S. 862, 863.

The issues tendered by the parties range broadly and involve the power of the Ohio Legislature, in view of existing federal legislation, to investigate activities deemed subversive of the forms of government within the Nation, cf. *Pennsylvania* v. *Nelson,* 350 U. S. 497; the power of the State to compel disclosure of matters interconnected with the protected freedoms of speech and assembly, cf. *NAACP* v. *Alabama,* 357 U. S. 449; *Sweezy* v. *New Hampshire, supra;* the existence of an expressed legislative interest for such an inquiry, and its definition and articulation to the person summoned, cf. *Watkins* v. *United States, supra; Sweezy* v. *New Hampshire, supra; Scull* v. *Virginia,* 359 U. S. 344; and the effect on testimonial compulsion of state immunity statutes not affording immunity from federal prosecution, cf. *Knapp* v. *Schweitzer,* 357 U. S. 371. But our disposition of these cases makes it unnecessary to consider the application of the principles of the cases just cited. The appellants were informed by the Commission that they had a right to rely on the privilege against self-incrimination afforded by Art. I, § 10, of the Ohio Constitution. The Ohio Supreme Court, however, held that the appellants were presumed to know the law of Ohio—that an Ohio immunity statute deprived them of the protection of the privilege—and that they therefore had committed an offense by not answering the questions as to which they asserted the privilege. We hold that in the circumstances of these cases, the judgments of the Ohio Supreme Court affirming the convictions violated the Due Process Clause of the Fourteenth Amendment and must be reversed, except as to one conviction, as to which we are equally divided. After the Commission, speaking for the State, acted as it did, to sustain the Ohio Supreme Court's judg-

ment would be to sanction an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him. We agree with that part of Judge Stewart's dissenting opinion in the Ohio Supreme Court in which he said: "since the defendants were apprised by the commission at the time they were testifying that they had a right to refuse to answer questions which might incriminate them, they could not possibly in following the admonition of the commission be in contempt of it . . . ." 164 Ohio St., at 563, 133 N. E. 2d, at 125. A rather detailed description of the proceedings below must be made to illuminate the basis of decision below and the turning point of our review of it here.

Mrs. Morgan, appellant in No. 463, was summoned before the Commission and interrogated mainly in regard to Communist Party activities. She appeared without counsel. To each question put she answered, "I regret that I cannot answer your question under the Fifth Amendment of the Constitution, because to do so would give your Committee an opportunity to incriminate me," or some more abbreviated form of words to the same effect. Such responses were given to virtually all the questions and in almost every case the Commission proceeded directly to ask its next question after receiving the response. In no case did the Commission direct that she answer its question. In one or two cases Commission members expressed surprise that she might consider an answer incriminating, and on such an occasion the Chairman asked her, "Mrs. Morgan, are you aware of the fact that your failure to answer questions—some questions of this Commission, might also tend to put you in an embarrassing situation?" At another point, the Chairman positively informed her, "I should like to advise you under the Fifth Amendment, you are permitted to refuse to answer questions that might tend to incriminate

you. . . . But you are not permitted to refuse to answer questions simply for your own convenience."

Raley, Stern, and Brown, appellants in No. 175, appeared before the Commission successively on another occasion, about six months later. They were interrogated about subversive activities in the labor movement. Raley answered some questions, but to most of them asserted the privilege against self-incrimination of the Federal and Ohio Constitutions. Most of his assertions of the privilege, including his initial ones, were not made the subject of comment or question by the Commission, the next question in the inquiry being put at once. On some few occasions, when Raley claimed the privilege, the Commission members indicated their doubts whether any answer to a specific question put could be incriminating. On one occasion, the Commission asked Raley as to whether he recollected a certain interview. Raley claimed the privilege. The Chairman took the view that Raley was required to speak as to whether he recalled the interview, but assured him that the privilege existed as to the details of the interview: "If you recall it, and we ask you as to your recollection, then you are privileged to claim your rights under the Constitution . . . ." This and one other occasion were the only ones in which the Commission even approached directing an answer to a question by Raley; but in one case the Chairman finally asked Raley to confer with his counsel to determine whether in his opinion the privilege applied, and in another Raley did so of his own accord; then, upon an affirmative reply by Raley's counsel, the Commission passed at once to the next question.[2]

---

[2] After the Chairman's initial statement quoted in the text, and some exchange between the Chairman and Raley's counsel, the following occurred:

"Chairman Renner: I should like for you to consult with counsel to determine whether in his opinion you are required to answer

Stern was the next person to appear at the inquiry. After giving his name, he claimed the privilege against self-incrimination at the very next question, which called for his address. Commission counsel asked him, "Is there something about the nature or character of the home in which you live that to admit you live there would make you subject to criminal prosecution?" On Stern's continued refusal to answer, the Chairman directed an answer to the question, which was refused. To most subsequent questions, Stern again claimed the privilege against self-incrimination, and on the great majority of questions, the Commission simply passed on to the next question. The Chairman and Stern worked out a short form of words whereby he would be understood to be claiming the priv-

---

the question, whether you recollect having had such an interview.

"The Witness: I have been advised by counsel that the privilege does apply, if I desire to use it.

"Chairman Renner: Counsel [for the Commission] may proceed."

Whereupon the next question was put. In the other instance Raley appears to have consulted with counsel of his own accord:

"Chairman Renner: Mr. Raley, would you explain to the Commission how you could incriminate yourself by acknowledging the location of the headquarters of Local 766 on that date?

"The Witness: I don't believe, Mr. Chairman, that I have to give a reason for asserting the privileges of the Constitution, so my answer would be the same to that that I gave Mr. Isaacs. [The Commission Counsel.] I will assert my privileges.

"Chairman Renner: I nevertheless request an answer.

"The Witness: Just a second while I confer with counsel.

"Mr. Berger [Raley's counsel]: I would like to hear the question read.

"Chairman Renner: Read the question, please.

"(Several questions and answers read by the reporter.)

"Mr. Berger: That is what I thought.

"(The witness conferred with counsel.)

"The Witness: I think I was correct in view of the line of questions that I have to assert my privileges under the Constitution.

"Chairman Renner: Counsel will proceed."

And again the next question was forthwith put.

ilege as to a particular question.[3]   At one point Stern asked the Commission if the Commission had the right to go into his opinions and to require him to speak as to them. The Chairman informed him, "Not if in your opinion by so doing, you might tend to incriminate yourself."   On a few occasions the Chairman requested that Stern answer a question, but except for the question as to his residence, the occasions were those in which Stern had neither given a direct answer nor invoked the privilege, and upon assertion of the privilege in these cases the request was not renewed.[4]

---

[3] "Chairman Renner: Counsel, just a moment. When you say you claim the privilege, you claim the privilege of not replying by reason of the fact that your answer might tend to incriminate you?

"The Witness: I claim the privilege of not answering under the Fifth Amendment of the United States Constitution, and Section 1, Article 10 of the Ohio Constitution, as I understand them.

"Chairman Renner: I do not insist that you recite in full the precise article or section of the Bill of Rights of the state of Ohio, or the Federal Constitution, but in your reply, if you are resorting to those sections, make it clear that you are resorting to those sections, or let us have an understanding that when you say, 'The same answer,' that that is what it means.

"The Witness: It means that I claim the privilege of the Fifth Amendment, of the United States Constitution, and Article 1, Section 10 of the Ohio Constitution, as I understand them.

"Chairman Renner: And when you say, 'I claim the privilege,' that is what you mean in full; is that correct?

"The Witness: That is correct."

[4] One such exchange was as follows:

"Chairman Renner: The chair will ask the witness to answer the question that has been placed by Counsel. It is to be presumed that the witness is excused from answering the previous question. We are trying to make it easier for you, Mr. Stern.

"The Witness: I plead the privilege.

"By Mr. Isaacs:

"Q. I take it you are not making the denial that you started to make before?

"A. I invoke the privilege."

Whereupon the next question was put.

Brown then was subjected to inquiry. He claimed the privilege as to self-incrimination to most of the questions put to him. While the Chairman never told him in so many words (as he had told the other three appellants) that the privilege was available, Brown and the Chairman engaged in long colloquies in an attempt by the Chairman to clarify that by using a certain form of words Brown was claiming the privilege.[5] The Chairman's con-

[5] "Chairman Renner: What do you mean when you say 'The answer is the same'?

"The Witness: I mean when I say 'The answer is the same,' the preceding question that was asked me, linking up with the next question that is asked me, I answered the first question. I said I invoked the Fifth Amendment of the United States Constitution.

"Chairman Renner: You mean you refuse to answer?

"The Witness: I did not say I refuse. I didn't refuse and I don't know what you mean. I said, 'invoked.' Do you know what the word 'invoked' means?

"Chairman Renner: Do you refuse to answer?

"The Witness: The answer is the same."

Later, the Chairman tried again:

"Chairman Renner: Each time you have replied by saying, 'The answer is the same,' that full explanation that you have given, is that what you mean; is that correct?

"The Witness: I understand this amendment to mean that I can't be forced to testify against myself.

"Chairman Renner: And each time that you say the answer is the same, you mean to invoke that right; is that correct?

"The Witness: When a question is projected to me—

"Chairman Renner: Will you answer my question?

"The Witness: By you, I will answer that question on the basis of that question that is projected at that time. . . .

"Chairman Renner: I am simply trying to clarify for the record what you mean each time you say, "The answer is the same.'"

On another occasion, the Chairman had the matter cleared up, at least for a while:

"Chairman Renner: What do you mean, 'the answer is the same'?

"The Witness: In regard to that question, in the manner in which

cern is inexplicable on any other basis than that he deemed the privilege available at the inquiry, and his statements would tend to create such an impression in one appearing at the inquiry. When once he made it clear that he was claiming the privilege as to a question, Brown was never directed to answer. He was on a couple of occasions directed to answer a question when he was engaging in a colloquy with the Commission without either having answered it directly or having claimed the privilege; upon his claim of the privilege, the next question was at once put.[6]

The Ohio immunity statute extends, so far as is here relevant, to any person appearing before a legislative committee and grants immunity from state prosecutions or penalties "on account of a transaction, matter, or thing, concerning which he testifies"; the statute declares that the testimony given on such an appearance "shall not be used as evidence in a criminal proceeding" against the person testifying. Ohio Rev. Code § 101.44. For reasons unexplained, the existence of this immunity was never suggested by the Commission to any of the appellants, and in fact, as the above statement makes evident,

---

that question was phrased, I again invoke—see—the Fifth Amendment of the Constitution of the United States, see? Do you understand what that means?

"Chairman Renner: That is what I wanted.

[6] The following is illustrative:

"Q. I ask you if it is not a fact that in February of 1950, you caused to be distributed a leaflet stated to be issued by the Workers Club, Emmett C. Brown, Chairman, 1064 Flint Street?

"A. Is that a fact?

"Q. I am asking you to affirm or deny that fact.

"A. If you know it, why ask me to affirm?

"Chairman Renner: Answer the question, Mr. Brown.

"The Witness: I invoke the privileges of the Fifth Amendment."

Whereupon the next question was asked.

the Commission's actions were totally inconsistent with a view on its part that the privilege against self-incrimination was not available. The Commission thought the privilege available, and it gave positive advice that it could be used. As the Chairman testified in the proceedings below: "It was the policy of the commission not [to] press questions which we felt would be of an incriminating nature. For instance, whenever a witness was asked a question—I believe every witness before the commission was asked the question—Are you or have you ever been a member of the communist party, and if the witness refused to answer that question, we did not press. it. Frequently I made statements which indicated the policy of the commission."

Indictments were found against the four appellants for failure to answer various of the questions put to them at the inquiry. In the cases of Raley, Stern, and Brown— who were indicted at the same time and tried together, but in a different court from Mrs. Morgan—only a few of the questions were made the subject of the indictment.[7] There appears to have been some effort to restrict their indictments to those questions to which the prosecution thought no answer could have been incriminating. On the other hand, virtually every question asked Mrs. Morgan was made the subject of her indictment.[8]

A jury was waived by Raley, Stern, and Brown, and they were found guilty on each of the relatively few counts found against them, the trial court filing no opinion or conclusions of law. The Court of Appeals affirmed the

---

[7] Sixteen against Raley, two against Stern, four against Brown. These were minor fractions of the numbers of questions put them to which the privilege was pleaded.

[8] The only omissions appear to be in regard to several pleas of self-incrimination made by Mrs. Morgan, when, in handing a statement to the Commission for the record, she was asked whether it was her statement.

convictions on some of the counts as to Raley, on one of the two counts as to Stern, and on all the counts as to Brown, and reversed the convictions on some of the counts as to Raley and on one count as to Stern.[9] 100 Ohio App. 75, 99–100, 136 N. E. 2d 295, 315–316. It held that there was sufficient direction to the witnesses to answer the questions involved, so that their refusal was willful. The touchstone by which it affirmed some of the counts of the convictions and reversed others was whether, in the court's view, an answer to the question might have in fact been incriminating. While the court indicated that the immunity statute applied, it did not rely upon it in its judgment—as it expressly stated, 100 Ohio App., at 99, 136 N. E. 2d, at 315, and as its reversals of certain of the counts indicated.

A jury was also waived by Mrs. Morgan and she too was found guilty by a trial judge. The judge acquitted her on a few counts as to questions found not pertinent to the inquiry or duplicative of other questions. But as to the remaining counts, he ruled that her plea of self-incrimination was not valid, because she had referred solely to the Fifth Amendment and not to the appropriate provision of the Ohio Constitution guaranteeing freedom from compulsory self-incrimination. Ohio Const., Art. I, § 10. Because of this, he held that it was unnecessary to have directed Mrs. Morgan to answer the questions or to have advised her at the inquiry that her plea of the privilege against self-incrimination was rejected. Further constitutional claims were summarily rejected. The Court of Appeals—a different one from that which passed on the appeal of Raley, Stern, and Brown—affirmed the judgment for the reasons stated in the trial court's opinion.

On appeal, the Supreme Court of Ohio, though affirming the convictions, abandoned reliance on the theories

---

[9] The State did not appeal the reversals.

under which the appellants were found guilty by the courts below. It ruled that a fair reference to the privilege against self-incrimination of the United States Constitution was adequate to invoke the privilege under the Ohio Constitution, finding such reference made. 164 Ohio St., at 538–539, 133 N. E. 2d, at 111–112. And it did not discuss the theory on which the Court of Appeals relied in the case of Raley, Stern, and Brown; its basis for affirming the judgment was entirely independent of that of the Court of Appeals. The Supreme Court placed its reliance entirely on the immunity statute. It held that the immunity under the statute was automatically available to the appellants, that even though it did not preclude federal prosecution it was adequate to make answers compellable, and that since "the immunity granted . . . precluded the possibility of justifying a refusal" to answer on the grounds of self-incrimination, 164 Ohio St., at 553, 133 N. E. 2d, at 120, a direction by the Commission to the appellants to answer was not necessary. Various objections to the convictions under state law were also passed on and rejected. As we have noted, on remand from this Court, the Ohio Supreme Court passed on contentions made under *Sweezy* v. *New Hampshire, supra,* and *Watkins* v. *United States, supra,* and adhered to its former judgments.

*First.* We must examine our jurisdiction over these appeals. Appellants assert jurisdiction under 28 U. S. C. § 1257 (2), a grant of jurisdiction on appeal, "where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity." In their notices of appeal to this Court, appellants have phrased some of their federal constitutional claims as attacks on the constitutionality of the Ohio statute authorizing the Commission and the statute providing for immunity. But this does not suf-

fice: "It is essential to our jurisdiction on appeal . . . that there be an explicit and timely insistence in the state courts that a state statute, as applied, is repugnant to the federal Constitution, treaties or laws." *Charleston Federal Savings & Loan Assn.* v. *Alderson*, 324 U. S. 182, 185. Despite the import of our order postponing the consideration of jurisdiction till the hearing on the merits, see Rule 16 (4) of this Court,[10] appellants have made no effort to support their burden of demonstrating an attack made by them on the validity of a state statute in the state courts, and we have found none. Accordingly the appeals are dismissed. See *Sweezy* v. *New Hampshire, supra,* at 236. But since various rights, privileges and immunities under the Federal Constitution were claimed below, 28 U. S. C. § 1257 (3), we consider the appeal papers as petitions for certiorari, and in view of the public importance of the questions presented, grant certiorari. 28 U. S. C. § 2103.

The view we take of the merits of the case requires us to examine whether the appellants made a proper challenge to their convictions below, on federal constitutional grounds, on the theory that they were being convicted for claiming the privilege against self-incrimination after not being given to understand at the time of the inquiry that such a privilege was unavailable. In the lower Ohio courts, federal constitutional questions as to the adequacy of the insistence of the Commission on an answer to its questions were involved in the lower courts' discussion of the cases. In the appeal of Raley, Stern and Brown, the Court of Appeals discussed the extent to which the Commission gave the defendants to understand that answers were in fact desired to particular questions, and this as

---

[10] "If consideration of the question of jurisdiction is postponed, counsel should address themselves, at the outset of their briefs and oral argument, to the question of jurisdiction."

part of its consideration of constitutional claims under both the Federal and Ohio Constitutions. 100 Ohio App., at 87–90, 136 N. E. 2d, at 308–310. The trial court's opinion, in Mrs. Morgan's case refers to the contention that a direction to answer was not given to the defendant, and also recites that a due process claim under the Federal Constitution was made.

The assignments of error made by Mrs. Morgan in the State Supreme Court show that she claimed in that court that the judgment of conviction was violative of due process, as guaranteed by the Federal Constitution, in that while she claimed the privilege, she was not "charged with refusal to answer any questions asked by members of the Commission and that she was not notified that her claim of the privilege was rejected by the Commission." The State Supreme Court passed on this claim,[11] holding that a direction to answer was unnecessary because of the immunity statute, and stated generally that its reasoning and conclusions in her case "apply with equal force to the appeal of Raley, Stern and Brown." 164 Ohio St., at 532, 133 N. E. 2d, at 108. There can be no question as to the proper presentation of a federal claim when the highest state court passes on it. See *Manhattan Life Ins. Co.* v. *Cohen,* 234 U. S. 123, 134. We think this sufficient here to satisfy the statutory requirement that the federal

---

[11] Said the court: "It is argued also that the *Quinn case, supra,* [*Quinn* v. *United States,* 349 U. S. 155] is, in effect, a mandate by the Supreme Court of the United States to all legislative bodies, both national and state, that they must specifically direct a witness to answer before he may be cited for contempt, and a directive to all judicial tribunals in the nation that such must be the case before a witness may be convicted of contempt." 164 Ohio St., at 545, 133 N. E. 2d, at 115. Clearly this was a discussion of whether the theory of the *Quinn* case, that a witness must be apprised of the rejection of the privilege, was binding on the States as a matter of the Federal Constitution.

right sought to be vindicated in this Court be one claimed below. 28 U. S. C. § 1257 (3).[12]

*Second.* We conclude that the judgments of conviction rendered below violate the Due Process Clause of the Fourteenth Amendment, with an exception to be later noted. We need not decide whether there is demanded of state investigating bodies as explicit a rejection of a claimed privilege against self-incrimination as has been held to be necessary under the statute punishing contempts of Congress. *Quinn* v. *United States,* 349 U. S. 155; *Emspak* v. *United States,* 349 U. S. 190, 202; *Bart* v. *United States,* 349 U. S. 219. Nor need we decide whether it would be a sufficient basis for reversal here simply that the appellants were not given notice of the immunity law at the inquiry, though in analogous contexts we have insisted that state investigators make clear to those before them the basis on which an answer is required. *Scull* v. *Virginia,* 359 U. S. 344, 353. This case is more than that; here the Chairman of the Commission, who clearly appeared to be the agent of the State in a position to give such assurances, apprised three of the appellants that the privilege in fact existed, and by his behavior toward the fourth obviously gave the same impression. Other members of the Commission and its counsel made statements which

---

[12] It is true that the assertion of violation of federal rights through the lack of a direction to answer, passed on below, does not precisely match the dispositive ground of the case, that is, not merely the absence of a direction to answer on the part of the Commission, but the positive assurances that the privilege was available. But this is really only a variation of the former theme, put into sharper focus by the State Supreme Court's theory of decision. See *Dewey* v. *Des Moines,* 173 U. S. 193, 198. The claim made and passed on was, in essence, lack of knowledge by the appellants, because of the Commission's actions, that they were being considered as unlawfully refusing to answer the questions. The Supreme Court's conclusion added more force to the contention but did not change its nature.

were totally inconsistent with any belief in the applicability of the immunity statute, and it is fair to characterize the whole conduct of the inquiry as to the four as identical with what it would have been if Ohio had had no immunity statute at all. Yet here the crime said to have been committed by the appellants, as defined by the State Supreme Court, was simply that of declining to answer any relevant question on the ground of possible self-incrimination. This was because the Court held that the Ohio immunity statute automatically removed any basis for a valid claim of the privilege, which generally exists under Ohio law.[13] Ohio Const., Art. I, § 10. Accordingly, any refusal to answer, based on a claim of the privilege, was said to constitute the offense. While there is no suggestion that the Commission had any intent to deceive the appellants, we repeat that to sustain the judgment of the Ohio Supreme Court on such a basis after the Commission had acted as it did would be to sanction the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him. Cf. *Sorrells* v. *United States,* 287 U. S. 435, 442. A State may not issue commands to its citizens, under criminal sanctions, in language so vague and undefined as to afford no fair warning of what conduct might transgress them. *Lanzetta* v. *New Jersey,* 306 U. S. 451. Inexplicably contradictory commands in statutes ordaining criminal penalties have, in the same fashion, judicially been denied the force of criminal sanctions. *United States* v. *Cardiff,* 344 U. S. 174. Here there were more than commands simply vague or even contradictory. There was active misleading. Cf. *Johnson* v. *United States,* 318 U. S. 189, 197. The State Supreme Court dismissed the statements of

---

[13] Accordingly, the applicability of *Twining* v. *New Jersey,* 211 U. S. 78, to the present case need not be discussed.

the Commission as legally erroneous, but the fact remains that at the inquiry they were the voice of the State most presently speaking to the appellants.[14] We cannot hold that the Due Process Clause permits convictions to be obtained under such circumstances.

We cannot reach a contrary conclusion by joining with the speculation of the court below that some of appellants might have behaved the same way regardless of what the Commission told them. We think it impermissible in a criminal case to excuse fatal defects by assuming that a person summoned to an inquiry, simply because he expresses defiance beforehand, will continue to be defiant even if a proper explanation is made of what the inquiry wants of him and the basis on which it is wanted. See *Flaxer* v. *United States,* 358 U. S. 147, 151. It is alleged that the personal attitudes of the appellants toward the Commission were defective in various ways, but of course the indictments and convictions were had simply for refusing to answer questions. Neither can we find any ground for affirmance in the fact that certain refusals to answer occurred before the Chairman's assurances to the various appellants that the privilege existed became explicit. Certainly such assurances removed any reason for the appellants to reconsider their prior assertions of the privilege. And the positive assurances given only made explicit an attitude that the Commission had manifested throughout its interviews with these appel-

---

[14] The State Supreme Court relied on *Sinclair* v. *United States,* 279 U. S. 263, 299, in support of its holding. *Sinclair* dealt with a witness at an investigation who refused to answer questions by reason of a legal theory he entertained, where the Committee rejected his legal theory explicitly and ordered him to answer. He refused and was convicted. The Court found his legal theory in error, and held that under the circumstances the entertaining of this erroneous legal theory in good faith was no defense to the witness. That *Sinclair* is wholly inapposite here requires no further statement.

lants. We cannot carve the inquiry into segments; the record does not suggest any picture of the Commission's negation of the privilege followed by an acquiescence in its use.

Finally, it is argued that the convictions may be supportable here as to those questions which an appellant was directed to answer after claiming the privilege. As the statement of the case we have made indicates, it is not shown that there was such a direction as to any question except one put to Stern,[15] which stands as the basis for the sole count on which his conviction rests. As to the conviction based on this question, the Court is equally divided. To four of us, the matter is plain. Under the circumstances of the inquiry, the direction to answer given Stern was obviously not given because of the immunity statute, but because the Commission took the position that a generally available privilege did not

---

[15] It is suggested that Brown declined to answer one question other than on grounds of self-incrimination. No such finding was made by the Ohio Supreme Court, which treated the entire case as involving pleas of self-incrimination; accordingly, so do we. No direction to answer as to this question was given by the Commission. It may be well to quote the entire context:

"Q. And what has been your educational background?

"A. I refuse to answer that question. I invoke my rights and privileges under the Fifth Amendment.

"Q. Is there some particular illegal institution which you attended or some Communist Party school that you attended that makes you hesitate to reveal where you were educated?

"A. No, I just don't think it is your business.

"Chairman Renner: We will determine that, Mr. Brown.

"By Mr. Isaacs:

"Q. Do I understand, for the record, you are refusing to answer the question because you feel it is not our business?

"A. The answer is the same.

"Mr. Isaacs: May the record show that, please.

"Q. [Going on to the next question] What has been your employment record in recent years, Mr. Brown?"

exist as to a particular question, since no answer to it could possibly incriminate. Stern made his decision not to answer, it must be assumed, in the light of the Commission's attitude that the privilege generally applied, and on the basis of his own determination that the answer would tend to incriminate him. The Ohio Supreme Court has not disagreed with him on the issue on which he was directed to answer; it made no finding that the Commission was correct on the basis on which it ordered the answer—that no response to the question possibly could incriminate.[16] Four of us think that the same affront to the Due Process Clause as is generally presented in this case is presented by a judgment ignoring the grounds on which the Commission's direction to answer was given, and affirming the conviction by reason of an immunity statute whose existence the Commission negated. To four of us, it is obvious that Stern was as much "entrapped" as the others. It is hardly an answer, in our view, to say he was directed to answer the question. In effect, the Commission said to Stern: "We recognize your privilege against self-incrimination in this inquiry, but you must take care that you claim it only where your answer might really tend to be incriminating. We do not see how saying where you live might incriminate you, so as to this question we reject your claim of privilege and order you to answer." Stern's refusal to answer after

---

[16] While one of the Ohio Courts of Appeals put its affirmance of some of the counts on this basis, the issue whether any particular questions were free of the possibility of an incriminating answer was not considered by the Ohio Supreme Court, and was in fact irrelevant to the court, under the view it took of the case. We review its judgment here, and it is basic that after finding constitutional error in a state court judgment we cannot affirm it here by postulating some ground of state law not relied on below. *Murdock* v. *Memphis*, 20 Wall. 590, 636, proposition 7; cf. *Bi-Metallic Investment Co.* v. *State Board of Equalization*, 239 U. S. 441, 444.

the direction opened him to the risk that a court might hold that he was wrong and that the Commission properly ruled that no answer could be incriminatory. But the Ohio Supreme Court has not held this; it has not held that Stern's decision that the answer would tend to incriminate him was wrong, but only that the Commission was wrong in telling him that the privilege applied at all. It may have been at his peril that Stern made his decision that the answer was incriminatory, but four of us cannot see how consistently with the Due Process Clause it can be said that he thereby also assumed the very different peril that the basic premise of what the Commission was telling him—that the privilege existed—was one hundred percent in error. We four regret that our Brethren remain unpersuaded on this score, and that accordingly as to Stern the judgment must be affirmed by an equally divided Court.

*Appeals dismissed.*

*On writs of certiorari, judgments reversed as to Raley, Brown and Morgan; judgment affirmed as to Stern by an equally divided Court.*

MR. JUSTICE STEWART took no part in the consideration or decision of these cases.

MR. JUSTICE CLARK, with whom MR. JUSTICE FRANK-FURTER, MR. JUSTICE HARLAN and MR. JUSTICE WHITTAKER join.

We think the conviction of Stern must be affirmed. Like our Brethren who would reverse as to him we, too, agree with Judge Stewart, of Ohio's Supreme Court. But, as we read his opinion, he swept with a whisk broom not a carpet sweeper. Our Brothers take too broad a swath.

Judge Stewart said that since Ohio's Commission advised appellants that they had a right to refuse to answer questions which might incriminate them, "they could not possibly in following the admonition of the Commission be in contempt of it" in refusing to answer any such queries. Brother BRENNAN's opinion characterizes the action of the Commission.as an "indefensible sort of entrapment . . . convicting a citizen for exercising a privilege which the State clearly had told him was available to him." We agree that such was true as to three of these appellants, and therefore concur in the opinion as to Brown, Raley and Morgan. But, as Judge Stewart went on to point out, the record clearly shows that Stern was not so entrapped.[1]

Stern was convicted for refusal to answer the question, "Where do you reside, Mr. Stern?" The Chairman refused to accept Stern's plea of the privilege [2] and twice

---

[1] Judge Stewart said that the witnesses could not have been in contempt "except as to the few questions which two of them were directed to answer." 164 Ohio St., at 564, 133 N. E. 2d, at 126. The second witness whom Judge Stewart had in mind would seem from the record before us to be Brown. The first count of Brown's indictment was based on a refusal to answer the question, "And what has been your educational background?" After pleading the privilege, Brown was pressed for an explanation as to why his answer would be incriminating. Brown responded "I just don't think it is your business." When pressed further, Brown reverted to the privilege. On the record here, we find no specific direction to Brown to answer, and thus we must concur in the reversal of Brown's conviction. The question of the sufficiency of the plea will, of course, be open on remand.

[2] The pertinent colloquy following Stern's refusal to answer was as follows:

"Q. What is there in either of those constitutions [Ohio and federal] that permits a witness to refuse to state where he resides?

"A. I claim the privilege under the Fifth Amendment of the

unequivocally directed him to answer the question. Stern persisted in his refusal. The due process ground used in our Brother BRENNAN's opinion to invalidate the convictions of Brown, Raley and Morgan is, therefore, not present as to Stern. There was no "entrapment" in the above question upon which he was convicted, since it was made clear, even without reference to the Ohio immunity statute, that as to that question the privilege was not available. The reason given by the Commission, except where bad faith is necessary which is not true here,[3] is irrelevant. The test is whether the witness was commanded to answer regardless. Neither Morgan nor Raley was so directed, but Stern was categorically instructed to do so.[4]

---

United States Constitution, and Section 1, Article 10 of the Ohio Constitution.

"Q. Is there something about the nature or character of the home in which you live that to admit you live there would make you subject to criminal prosecution?

"A. The same answer.

"Chairman Renner: The chair will request that the witness answer the question.

"The Witness: I have answered the question.

"Mr. Isaacs [the Commission's Counsel]: Mr. Chairman, I ask that the witness be ordered and directed to answer the question.

"Chairman Renner: The chairman directs the witness to answer the question relating to his address, the address of his residence in Cincinnati.

"The Witness: The same answer.

"Q. [By Mr. Isaacs]: As a matter of fact, Mr. Stern, you reside at 3595 Wilson Avenue in the city of Cincinnati, Ohio; is that not correct?

"A. The same answer."

[3] Under Ohio law as announced in the opinion below it is not necessary to show a "willful" or "deliberate" refusal to answer. 164 Ohio St., at 543, 133 N. E. 2d, at 114.

[4] As to Brown, see note 1, *supra*.

Admitting that the direction to answer was "obviously . . . [given] because the Commission took the position that a generally available privilege did not exist," four members of the Court still refuse to affirm as to Stern because the State Supreme Court did not go on that ground. But they overlook the sweep of their own opinion. It is the Federal Due Process Clause that is being applied and the Court must take the facts as shown by the record. It clearly shows that Stern was not entrapped by the statements of the Chairman as to the availability of the privilege for the question forming the basis of the only count of the indictment before us. Unlike the others, he was specifically ordered to answer. In this posture of the facts there could be no entrapment and hence no lack of due process. We would therefore affirm as to Stern.