IN the MATTER OF the REFUSAL OF
Richard L. VERKLER:

STATE of Wisconsin, Plaintiff-Respondent,

v.

Richard L. VERKLER, Defendant-Appellant.†

Court of Appeals

*No. 02–1545. Submitted on briefs November 18, 2002.—Decided January 29, 2003.*

2003 WI App 37

(Also reported in 659 N.W.2d 137.)

† Petition to review denied 6-12-03.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Christopher A. Mutschler* of *Anderegg & Mutschler, LLP* of Fond du Lac.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Thomas L. Storm*, district attorney.

On behalf of the plaintiff-respondent, there was a supplemental brief filed by *Peggy A. Lautenschlager*, attorney general, and *Susan M. Crawford*, assistant attorney general.

Before Brown, Anderson and Snyder, JJ.

¶ 1. BROWN, J. In *State v. Reitter*, 227 Wis. 2d 213, 217–18, 595 N.W.2d 646 (1999), our supreme court held that law officers are under no affirmative duty to advise custodial defendants that the right to counsel does not apply to the implied consent setting. However, the court also appears to have held that, as a matter of due process, if an officer either explicitly assures or implicitly suggests that a custodial defendant has a right to counsel, then the officer may not thereafter mark down a refusal if the defendant acts upon that assurance or suggestion. *See id.* at 240–42. The defendant in this case, Richard L. Verkler claims that the officer, by his actions, at least implicitly suggested that Verkler had the right to consult with an attorney before deciding whether to submit to a breath test. Verkler further contends that the officer then marked him down as having refused because he insisted on consulting with his attorney first. We do not agree that the officer implicitly suggested a right to counsel before taking the test. In fact, the facts show that just the opposite occurred. We affirm.

¶ 2. On January 20, 2002, Verkler was stopped for speeding. During the stop, the officer noted that Verkler smelled of intoxicants, had bloodshot eyes and also slurred his speech. The officer then requested that

Verkler perform field sobriety tests but Verkler declined, citing a medical condition similar to multiple sclerosis. Verkler's two passengers confirmed this condition: his wife and his law partner. Having no reason to doubt the existence of the medical condition, the officer dropped his request. The officer then requested that Verkler submit to a preliminary breath test. Verkler declined to submit to this test, saying he did not believe in it. He was arrested for OWI and placed in the back seat of the squad car. He requested that he be able to consult with his law partner and the officer allowed that. Verkler and his law partner then sat in the back of the squad car and conversed privately. Eventually, the officer called a halt to the conversation, saying that he had to transport Verkler to the police station. Verkler's wife and his law partner followed the squad to the police department.

¶ 3. At the police department garage, Verkler asked the officer if his law partner was going to join them and the officer replied that "she can't." Verkler told the officer that he wanted to consult with her, but was told, "[w]ell, she can't come in here." Once in the intoxilizer room, Verkler again asked to speak to his law partner, but his request was denied. The officer pointed to a newspaper clipping that hung on the wall. Verkler testified that the clipping seemed to say that a person is not entitled to have the advice of counsel as to the decision of whether to take the breath test. Verkler was then read the Informing the Accused form and was asked to submit to the breath test. Without hesitation, he replied, "No." The officer again asked Verkler if he would submit, this time informing Verkler that there was a penalty for refusing to submit, and again Verkler replied, "No." The trial court found that Verkler had

unreasonably refused to take the test.[1] Upon a motion for reconsideration, specifically requesting that the trial court review its findings in light of *Reitter*, the court made, in pertinent part, the following written answer: "The officer did not have to allow the defendant's law partner to converse with him about the situation. It was a courtesy extended to the defendant and not a right as a matter of law." Verkler then appealed both the original order that the refusal was unreasonable and the order denying reconsideration.

¶ 4. This court is very familiar with *Reitter* since it was this district which certified the case to the Wisconsin supreme court. *See State v. Reitter*, 1998 WL 731234 (No. 98–0915) (Oct. 21, 1998). As pointed out by Verkler in his brief, this court observed that *Miranda*[2] is now a household word in the United States. We further observed that the Informing the Accused form is so similar in procedural design to a *Miranda* warning that a reasonable person might be confused about whether he or she is entitled to the assistance of counsel. We noted that a minority of states requires officers to explain to custodial defendants that there is

---

[1] We refer to Verkler's refusal as "unreasonable" because this is the term the trial court used. We acknowledge that while at one time the test for the propriety of a refusal was "reasonableness," the legislature eliminated the test many years ago. The implied consent law no longer uses reasonableness as the test for a proper refusal. Now the test is whether the defendant has the physical inability to submit to the test as a result of physical disability or disease. *See Village of Elkhart Lake v. Borzyskowski*, 123 Wis. 2d 185, 191, 366 N.W.2d 506 (Ct. App. 1985). We note that we will continue to refer to Verkler's refusal in terms of its "reasonableness" throughout this opinion in order to avoid confusion.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

no right to consult with an attorney on the question of whether to submit to a blood alcohol test and asked the supreme court whether a similar duty should be imposed in this state. The supreme court accepted our certification and wrote a thoroughly reasoned opinion, holding that there was no such duty on the part of law officers according to statute and that due process did not require that such a duty be imposed. *Reitter*, 227 Wis. 2d at 242–43. That part of the *Reitter* decision is not at issue in this case.

¶ 5. But the supreme court went further than the question raised in our certification. Reitter had not only asserted a constitutional right (which the court found he did not have), he also contended that the deputy in his case "actively misled" him into believing that the right to counsel existed. *Id.* at 240. Reitter relied upon *Raley v. Ohio*, 360 U.S. 423 (1959), for his proposition. *Reitter*, 227 Wis. 2d at 241. Our supreme court then explained the *Raley* case as follows:

> In *Raley*, the State of Ohio had assured the defendants that they could invoke the privilege against self-incrimination when they testified before the Ohio Un-American Activities Commission. State officials, however, neglected to inform the defendants about an Ohio immunity statute that expressly deprived them of that privilege. After the defendants relied on the assurances about the privilege at the hearing and refused to answer questions, Ohio prosecuted them for criminal contempt. In pursuing the convictions, the state relied upon the immunity statute, suggesting the defendants were presumed to know about the statute. The Supreme Court held that due process rights had been violated because the express assurances were "actively misleading," causing the defendants to believe they had a right where none existed.

*Reitter*, 227 Wis. 2d at 241 (citations omitted).

¶ 6. Reitter wanted our supreme court to do two things. First, he wanted the court to acknowledge that the *Raley* rationale applies to cases where an officer tells a custodial defendant that he or she has a right to consult with an attorney before deciding whether to take a breath test, the custodial defendant relies on that right and wishes to consult with an attorney before deciding whether to submit to the test, and the officer marks down a refusal as a result of that reliance. *Reitter*, 227 Wis. 2d at 240–41. Second, Reitter wanted the court to agree with him that he fit the factual predicate. *Id.* at 241–42.

¶ 7. In our reading of *Reitter*, the court went halfway. While not specifically adopting the *Raley* rationale as applied to refusal situations, the supreme court's discussion of the issue convinces us that the court did adopt *Raley* in the implied consent context. We are also convinced that the court rejected Reitter's claim that he could avail himself of *Raley*. Our understanding is based on the following passage, which we quote in part:

> In this case, Reitter was not led to believe he had a right where none existed. Deputy Sipher neither expressly assured nor implicitly suggested that Reitter had a right to counsel. Unlike *Raley*, the State did not encourage Reitter to exercise a particular right, and the State did not neglect to inform Reitter about the statute . . . .
>
> This is not a case where the State chose to convict "a citizen for exercising a privilege which the State clearly told him was available to him."

*Reitter*, 227 Wis. 2d at 241–42 (citation omitted).

397

¶ 8. Our understanding from this passage in *Reitter*, therefore, is that there now exists a narrow exception to the rule announced by the supreme court in *State v. Neitzel*, 95 Wis. 2d 191, 204, 289 N.W.2d 828 (1980). The *Neitzel* rule is that wanting to first consult with counsel before deciding whether to submit to a breath test is not a valid reason to refuse and an officer is on solid grounds in marking a refusal if the custodial defendant relies on this explanation for not immediately agreeing to take the breath test. *See id.* at 205. The narrow exception is the *Reitter* rule: If the officer explicitly assures or implicitly suggests that a custodial defendant has a right to consult counsel, that officer may not thereafter pull the rug out from under the defendant if he or she thereafter reasonably relies on this assurance or suggestion. *See Reitter*, 227 Wis. 2d at 240–42.

¶ 9. We read Verkler to contend that his situation is the kind foreshadowed by the court in *Reitter* and that he should be successful where Reitter was not. But we are convinced that, upon the facts of his case, he has no better luck using the *Raley* rationale than Reitter had. The officer in this case did allow Verkler to privately consult with his law partner at the scene; there is no question about that. But we fail to see how this translates into a suggestion by the officer that Verkler would have the right to consult with a lawyer prior to deciding whether to submit to a blood alcohol test. In Verkler's own words, the consultation at the scene was not even about the test. Rather, it was about how to resolve his obligations under the law given his medical condition.

¶ 10. At no time out in the field did the officer expressly assure Verkler that he had a right to consult his law partner about whether he should take the upcoming breath test. At no time at the scene did the officer give any indication that Verkler had a right to consult with his law partner throughout the arrest and evidence gathering process. In fact, the undisputed testimony is that while the officer did allow a private chat to take place in the back of the squad car, he abruptly ended the chat moments later and announced that he was taking Verkler to the station. A reasonable person would come to the same conclusion that the trial court did. The officer allowed a short private conversation to take place between Verkler and his law partner as a matter of courtesy and exercised control by ending it at his command. The officer's action in ending the conversation is at odds with Verkler's view that the officer was honoring an attorney-client relationship.

¶ 11. What happened afterwards is also inconsistent with any suggestion on the part of the officer that there was some right to consult throughout the process. The officer transported Verkler to the station. There is no testimony that he invited the law partner to come to the station or implied that she would be able to talk with Verkler there. There is no testimony promising any future consultation to make up for the aborted get-together in the squad car.

¶ 12. At the station, while still in the garage area, Verkler asked to meet with his law partner and this request was refused. A reasonable person in Verkler's position would think, based on the officer's action at the station, that what happened at the scene was an anomaly, something that started and ended at the scene. Verkler persisted and again asked to see his law partner once ensconced in the intoxilizer room. Again,

399

he was denied. A reasonable person in Verkler's position would come to the conclusion that he or she was being told there was no right to consult with a lawyer at this point in time.

¶ 13. But there is more. There was a newspaper clipping on the wall of the intoxilizer room that the officer pointed out to Verkler. Verkler read the clipping. He understood the clipping to say that there was no right to consult with an attorney about whether to take the test. That he disregarded its authenticity because a lawyer did not write it is beside the point. He knew, if for some reason he did not know before, that the officer was telling him there was no consultation right. Far from being actively misled by the officer, the officer was, in no uncertain terms, informing Verkler that he was not going to have a right to consult about taking the test. He may have been allowed to talk to his law partner at the scene, but this does not translate into a suggestion that he could talk to his law partner at the police station about taking the breath test.

¶ 14. Verkler argues that the action of the officer in pointing to the newspaper article on the wall does not qualify as an explanation by the officer that there is no right to counsel. He seems to suggest that the explanation had to come from the officer's own words. We reject his argument. The action by the officer in pointing to the newspaper article on the wall in response to Verkler's request is just as powerful of a statement as one coming from his own words. The old axiom, "actions speak louder than words," plays well here. A reasonable person in Verkler's position would have no doubt about the message the officer was conveying.[3]

---

[3] While Verkler tries hard to devalue the significance of the posted news article, we note that the supreme court in *Reitter*

¶ 15. Verkler cites *Goss v.. Illinois*, 650 N.E.2d 1078 (1995), to support his position and asserts that the facts there present a fact pattern "eerily similar" to his situation. Goss was arrested for OWI and was transported to the police station for testing. *Id*. at 1078. The Informing the Accused form was read to him and he was then asked to take the test. *Id*. at 1078–79. Goss responded by asking for time to consult with his attorney. *Id*. at 1079. After initially refusing his request, the officer did an about face and let Goss call the attorney. *Id*. But shortly thereafter, the officer interrupted the

---

suggested this very thing as a means by which officers, while under no obligation to do so, could as a matter of courtesy notify custodial defendants that the right to counsel does not attach to the implied consent setting. *State v. Reitter*, 227 Wis. 2d 213, 232 n.14, 595 N.W.2d 646 (1999). The court wrote:

> We recognize officers might hesitate to even state this simple advisement, given the danger that a defendant may launch an "oversupply of information" attack on an officer's statutory compliance. There are, however, other alternatives for achieving the same result, such as *posting a sign on the wall above the chemical testing equipment* . . . .

*Id*. (emphasis added).

We think that the Fond du Lac sheriff's department was following the advice of the court by placing the news article in a conspicuous place in the intoxilizer room. While the *Reitter* court clearly told law enforcement officials that they were under no duty to advise custodial defendants that there was no right to counsel in the implied consent setting, it commented that it was the court's *preference* that it be done. A sign on the wall is one such method. A copy of a news article is another such method. To say that the department's act of putting the article on the wall and the officer's act in pointing to the article have no significance to the question of whether that officer had misled Verkler into believing that he had a right to consult with his attorney is contrary to reason.

conversation and told Goss "that his minute was up." *Id.* Thereafter, the officer renewed his question regarding the breath test and Goss refused to submit to the test because he could not obtain further advice from counsel. The Illinois Court of Appeals held in Goss's favor saying, "[o]nce a person is accorded rights not required by law, the revocation of those rights will vitiate the effect of any purported refusal to submit to a breathalyzer test." *Id.* Verkler argues that, like Goss, he was permitted to speak to his attorney after arrest. He argues that, while the consultation was interrupted, the conduct nonetheless firmly planted in Verkler's mind that attorney consultation was not only allowed, it was encouraged.

¶ 16. We disagree with Verkler. In our view, the facts in *Goss* are not only inapposite to the facts in the case at bar, but *Goss* actually supports our position. Goss was at the police station and the form had just been read to him. The big question, whether he would submit to the test, was being asked of Goss in real time. *Id.* At this point in time, Goss asked to speak with an attorney, a request that was allowed. *Id.* The clear import of *Goss* is that if the officer expressly assures a right to consult about whether to take a breath test, then the officer must honor that allowance. Here, however, Verkler was never told that he had a right to consult about whether to submit or refuse to submit to a breath test. The consultation which did occur was out in the field, far away from the real-time request to take the breath test. The real-time occurrences that Verkler had with the officer about whether he could have counsel during the intoxilizer process were met with refusals by the officer to allow attorney-client consultation. *Goss* is not helpful to Verkler.

402

¶ 17. Finally, while Verkler steadfastly maintains that he is not raising a "confusion defense," his brief launches into a long, winding discussion which ends in what can only be termed as a variant of the confusion defense. He reads into *Reitter* an adoption of this variant form. He reasons that if the officer implicitly suggests a right to counsel, then—even though there is no subjective confusion defense allowed in Wisconsin—if the custodial defendant's confusion is the result of some act on the part of the police, and the defendant can show that he was thereby confused about whether he had such a right, then the court must conclude that the refusal was reasonable. He lifts eight instances from the text of the *Reitter* opinion where the word "confusion" appears, and based on the multiple use of this word, comes to the conclusion that the court was coming very close to adopting the variant of the confusion defense that we have described above. He suggests that his case was "foreshadowed" by the *Reitter* court.

¶ 18. We determine that it is unnecessary for us to discuss each and every one of the eight instances where the supreme court mentioned the word "confusion." We will note the eight instances in the footnote and leave them be.[4] We think it is sufficient for us to say only that

---

[4] "We observe that where a defendant expresses no confusion about his or her understanding of the statute, a defendant constructively refuses . . . ." *Reitter*, 227 Wis. 2d at 218.

"The record does not suggest Reitter was confused by Deputy Sipher's reading of the 'Informing the Accused Form.' " *Id.* at 221.

"Even if we were to apply the reasoning of *Heles*, the facts of that case, like those of *O'Connell*, pivot on one key distinction. In *Heles* and *O'Connell*, both courts addressed the possi-

the *Reitter* court never adopted this variant of the confusion defense. In fact, the court reiterated that there is no confusion defense in Wisconsin. *Reitter*, 227 Wis. 2d at 229. To the extent that the court discussed the confusion test in particular and the word "confusion" in general, it was in relation to matters not material to the question of whether the officer expressly assured or implicitly suggested that Reitter had a right to counsel. In fact, it related to a hypothetical situation

bility that the reading of *Miranda* warnings had 'confused' the defendants about general rights to counsel and the absence of that right under the implied consent laws. Fears that confused defendants be misled 'into making uninformed and unknowing decisions to take the test' prompted creation of the '*O'Connell* warning.' " *Reitter*, 227 Wis. 2d at 227. (Citations omitted).

"Wisconsin has not adopted the 'confusion doctrine.' In part, its application is unnecessary because *Miranda* warnings are not required in the implied consent setting." *Reitter*, 227 Wis. 2d at 229 (citations omitted).

"In this case, Reitter does not rely on a confusion theory. Reitter advances neither of the two premises other states require for the defense: reading of *Miranda* rights and a showing of actual confusion. Even if we were to extend the 'confusion doctrine' to Wisconsin, this is not the case in which to do so." *Reitter*, 227 Wis. 2d at 229–30.

"Had Reitter claimed his insistence for a lawyer fell under the shadow of a *Miranda* warning, he might have made an argument for obligating the State to clarify any resulting right to counsel confusion." *Reitter*, 227 Wis. 2d at 230.

"We therefore hold that where a defendant exhibits no confusion, the officer is under no affirmative duty to advise the defendant that the right to counsel does not attach to the implied consent statute." *Id.* at 231.

"Here, it is not clear whether Reitter was given *Miranda* warnings. We do not decide whether this case would have come out differently had Reitter been given those warnings." *Reitter*, 227 Wis. 2d at 230 n.13.

where an officer gave *Miranda* warnings to the operator. We are convinced that the confusion language related only to the first issue the *Reitter* court undertook—whether officers must advise custodial defendants that there is no right to consult with counsel before deciding whether to submit to a test—an issue that is not before this court. *Id.* at 227–31.

¶ 19. As to the issue that *is* before this court, we are satisfied that the *Reitter* court looked not to whether the custodial defendant was "confused" about the officer's actions, but whether the officer either expressly assured or implicitly suggested a right to counsel. If the officer did one or the other and the evidence is that the custodial defendant relied on the offering, and the officer nonetheless marked a refusal despite the defendant's reliance, then the refusal was reasonably made. That law can be easily understood and placed into operation without reference to any confusion defense. We reject Verkler's assertions to the contrary. We affirm the order finding the refusal to be unreasonable and the order denying the motion to reconsider.

*By the Court.*—Orders affirmed.