RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0291p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

HARRY MITTS,

        *Petitioner-Appellant,*

    *v.*

MARGARET BAGLEY, Warden,

        *Respondent-Appellee.*

No. 05-4420

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-01131—Dan A. Polster, District Judge.

Argued: March 9, 2010

Decided and Filed: September 8, 2010

Before: MERRITT, MARTIN, and SILER, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jeffry F. Kelleher, JEFFRY F. KELLEHER & ASSOCIATES, Cleveland, Ohio, for Appellant. Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Jeffry F. Kelleher, JEFFRY F. KELLEHER & ASSOCIATES, Cleveland, Ohio, Robert A. Dixon, Cleveland, Ohio, for Appellant. Justin M. Lovett, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

    MERRITT, J., delivered the opinion of the court, in which MARTIN, J., joined. SILER, J. (pp. 20-21), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

    MERRITT, Circuit Judge. This Ohio death penalty case turns on the validity of certain jury instructions that impose a mandatory death penalty that must be addressed

1

first by the jury before consideration is given to life imprisonment. The Ohio "acquittal first" death penalty instructions in this case are the same Ohio instructions that were given in the recent case of *Smith v. Spisak*, 554 U.S. ____, 130 S. Ct. 676 (2010). In *Spisak*, the Supreme Court held that in light of AEDPA the instructions did not violate the mitigation-unanimity holding of *Mills v. Maryland*, 486 U.S. 367 (1988). The essential constitutional question before us now is whether we should follow Justice Stevens' concurring opinion in the *Spisak* case, which concludes that, although the instructions do not violate *Mills*, the instructions do violate the principles of *Beck v. Alabama*, 447 U.S. 625 (1980). Justice Stevens, in his concurrence in *Spisak*, agreed that, "*Mills* does not clearly establish [under AEDPA] that the instructions at issue were unconstitutional. But, in my view, our decision in *Beck v. Alabama*, 447 U.S. 625 (1980), does." 130 S. Ct. 689 (Stevens, J., concurring). No other justice reached this *Beck* issue or stated an agreement or disagreement with Justice Stevens' view. Justice Stevens in his *Spisak* concurrence lays out his view that the principles of the *Beck* case constitute clearly established law under AEDPA and should invalidate the same jury instructions in *Spisak* that were repeated in the instant case. In light of Justice Stevens' concurrence, we asked the parties for supplemental briefing analyzing this case in light of *Beck*.

In essence, the jury instructions in the case before us require the jury to first determine whether the aggravating elements necessary for a mandatory death penalty are present and to impose the death penalty if the aggravating elements predominate: "If you make such a finding then *you must recommend to the court that a sentence of death be imposed* on the defendant, Harry D. Mitts, Jr." (Emphasis added.) Only if the jury first acquits the defendant of the death penalty may the jury consider life imprisonment or any lesser-included offense.

After rejecting the State's preliminary argument that Mitts has waived and procedurally defaulted his constitutional argument against the mandatory, "acquittal first" death penalty instructions, we consider and accept Justice Stevens' opinion that these death penalty instructions violate the principles announced in *Beck v. Alabama*,

*supra*. We then consider two other issues raised by Mitts respecting the ineffective assistance of counsel at the trial and guilt phases of the case and find them to be without merit.

# I.[1]

Mitts, an Ohio prisoner under penalty of death, appeals the district court judgment denying his petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. On the evening of August 14, 1994, Mitts drank bourbon until he became intoxicated and then shot and killed Bryant, an African American man, while speaking racial epithets. During the police shoot-out that followed, Mitts shot and killed Sergeant Glivar and wounded Lieutenant Kaiser and Officer Mackey before being apprehended.

At trial, Mitts did not contest the evidence proving that he had killed Bryant and Sgt. Gliver, but he instead attempted to establish that he was too intoxicated to form the required intent to kill. After a penalty hearing, the jury recommended the death penalty on both aggravated murder counts and terms of imprisonment for the attempted murders. The trial court sentenced Mitts to death for the aggravated murders and to terms of imprisonment for the attempted murders.

The Ohio Court of Appeals affirmed Mitts' convictions and sentences in December 1996. *State v. Mitts*, No. 68612, 1996 WL 732452 (Ohio Ct. App. Dec. 19, 1996). The Ohio Supreme Court affirmed the convictions and sentences in March 1998, and it denied rehearing in June 1998. The court ruled that the trial court should have instructed the jury to merge duplicative death penalty specifications, but it held that the error did not influence the jury and was cured by re-weighing on appeal. *Mitts*, 690 N.E.2d at 530.

Mitts filed a petition for post-conviction relief in September 1996 and an amended petition in March 1999. The trial court denied the petition in August 1999, and the Ohio Court of Appeals affirmed that decision in September 2000. *State v. Mitts*, No.

---

[1] A full account of the relevant facts can be found in *State v. Mitts*, 690 N.E.2d 522, 524-26 (Ohio 1998).

76963, 2000 WL 1433952 (Ohio Ct. App. Sept. 28, 2000). The Ohio Supreme Court denied further review. In April 2001, Mitts filed an application to reopen his direct appeal, alleging ineffective assistance of appellate counsel pursuant to Rule 26(B) and *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992). The Ohio Court of Appeals denied the motion in May 2002. *State v. Mitts*, No. 68612, 2002 WL 1335629 (Ohio Ct. App. May 10, 2002). The Ohio Supreme Court affirmed that decision. *State v. Mitts*, 784 N.E.2d 698 (Ohio 2003).

Mitts filed his petition for a writ of habeas corpus in the district court in October 2003, raising twelve claims. After a period of discovery, the district court dismissed the petition on all asserted claims of error in a comprehensive opinion. *Mitts v. Bagley*, No. 1:03CV1131, 2005 WL 2416929 (N.D. Ohio Sept. 29, 2005). Mitts timely appealed.

Mitts' federal habeas petition was filed subsequent to the passage of AEDPA in 1996, and thus its provisions govern this court's review. Under AEDPA, a federal court may not grant habeas relief unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under the "unreasonable application" prong of this section, the prong most relevant to the instant case, "[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly." *Price v. Vincent*, 538 U.S. 634, 641 (2003). Rather, "[i]n order for a federal court to find a state court's application . . . 'unreasonable,' the state court's decision must have been more than incorrect or erroneous[;] [it] must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). As this court has stated, "a federal habeas court must ask whether the state court's application of clearly established federal law was objectively reasonable. If the federal court finds that, viewed objectively, the state court has

correctly identified the governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case, it may grant the writ." *Millender v. Adams*, 376 F.3d 520, 523 (6th Cir. 2004).

In analyzing whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, a federal court may only look to the holdings of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412. The court may look to lower court of appeals' decisions to the extent they illuminate the analysis of Supreme Court holdings to determine whether a legal principle had been clearly established by the Supreme Court. *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003). Finally, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct. *See* 28 U.S.C. § 2254(e)(1); *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004).

We certified appealability of Mitts' following claims: (1) unconstitutional penalty-phase instructions; (2) ineffective assistance of counsel in the guilt phase of trial; and (3) ineffective assistance of counsel in the penalty phase of trial.

## II.

The State asserts waiver and procedural default as the basis for its argument that we should not reach the merits of Mitts' constitutional claim that the jury instructions in his case are improper. The State's argument is that Mitts "has never challenged his jury instructions under *Beck*, and no previous court in this case has ever referred to *Beck*." Supplemental Brief of Respondent-Appellee at 22. This statement is mistaken. Here the State's highest court considered on direct appeal a federal constitutional claim attacking precisely the same jury instruction and disposed of the appeal by citing one of its earlier cases that decided the same claim by reference to the same U.S. Supreme Court case, *Beck v. Alabama*. Thus, we have the Ohio Supreme Court in this case referring to an earlier Ohio Supreme Court case deciding the constitutionality of the same acquittal first mandatory death penalty instructions and doing so based on its interpretation of *Beck v. Alabama*, the case that is the basis of Mitts' theory here.

In rejecting Mitts' argument that the specific jury instructions at issue here — "if you make such a finding then you must recommend to the court that a sentence of death be imposed" — the Ohio Supreme Court simply referred to an earlier Ohio Supreme Court case that had discussed *Beck v. Alabama* when finding "acquittal first" instructions improper. *State v. Mitts*, 690 N.E.2d at 531, simply referred the reader to the state case of *State v. Thomas*, in which the Court declined to invalidate the mandatory instruction based on harmless error:

> This instruction does not expressly require unanimous acquittal on the charged crime . . . . The arguments of the parties as to the prejudicial effect, if any, of such instruction are somewhat less than clear. In our opinion, this instruction has negligible coercive potential because it speaks to the jury's inability to find, whether unanimously or not, a certain element of the greater offense.

533 N.E.2d 286, 293 (1988). This conclusion follows its discussion of the *Beck* case:

> The United States Supreme Court has expressly declined to hold whether or not a defendant is entitled to a lesser included offense instruction [on life imprisonment] as a matter of constitutional due process. *Keeble v. United States* (1973), 412 U.S. 205, 213, 93 S.Ct. 1993, 1998, 36 L.Ed.2d 844; *Beck v. Alabama* (1979), 447 U.S. 625, 637, 100 S.Ct. 2382, 2389, 65 L.Ed.2d 392, but has noted that "the nearly universal acceptance of the rule in both state and federal courts establishes the value to the defendant of this procedural safeguard." *Id.*

Thus, in Mitts' case the Ohio Supreme Court relies on the earlier *Thomas* case which rejects *Beck v. Alabama* as a basis for invalidating the jury instruction at issue. Perhaps the reference to the *Beck* case in the *Mitts* opinion could have been more explicit and the discussion more detailed. But the State is mistaken in its view that "no previous court" has "referred" to or rejected *Beck* as a basis for invalidating this type of mandatory death penalty instruction.

Mitts has not waived his *Beck* claim. In both his direct appeal and in his petition to reopen his direct appeal, Mitts argued that the jury instructions in his case were unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Mitts raised this jury instruction issue in the state court. The Court referred to *State v. Thomas*

— a case which relies primarily on federal law including *Beck*. Federal review does not turn on the quality, comprehensiveness or correctness of the state court discussion of the federal issue. The Supreme Court has repeatedly found that when a state decision relies upon federal cases or other state cases that rely on federal law, the issue has not been waived and review by a federal court is appropriate. *See*, *e.g.*, *Ohio v. Robinette*, 519 U.S. 33, 37 (1996) ("[T]he only cases [the opinion] discusses or even cites are federal cases, except for the one state case which itself applies the Federal Constitution"); *Illinois v. Rodriguez*, 497 U.S. 177, 182 (1990) ("The opinion does not rely on (or even mention) any specific provision of the Illinois Constitution, nor even the Illinois Constitution generally. Even the Illinois cases cited by the opinion rely on no constitutional provisions other than the Fourth and Fourteenth Amendments of the United States Constitution."); *Michigan v. Chesternut*, 486 U.S. 567, 571 n.3 (1988) (state court decision relied on two state cases that each relied upon federal law). *See also Harris v. Reed*, 489 U.S. 255, 263 (1989) ("unless the state court clearly expressed its reliance on an adequate and independent state-law ground, the Court may address the federal issue").

The State also argues that the Ohio Supreme Court only reached the federal question under "plain error" review and that we should decline review for this reason. Without "cause and prejudice" we do not address issues in which the state court has properly and fully invoked procedural default through application of a contemporaneous objection rule. *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). However, in the case where the state court goes on thereafter to address the federal Constitutional question under "plain error" review, we may address that question. *See Roy v. Coxon*, 907 F.2d 385, 391 (2d Cir. 1990); *see also Wainwright v. Greenfield*, 474 U.S. 284, 289 n.3 (1986) (collecting cases); *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985) ("the additional holding of the state court . . . depends on the court's federal-law ruling and consequently does not present an independent state ground for the decision rendered"); *Michigan v. Long*, 463 U.S. 1032, 1042 (1983) (state ground not independent "when it fairly appears that the state court rested its decision primarily on federal law"); *Raley v. Ohio*, 360 U.S. 423, 436 (1959) ("There can be no

question as to the proper presentation of a federal claim when the highest state court passes on it."); *Manhattan Life Ins. Co. of New York v. Cohen*, 234 U.S. 123, 134 (1914) (duty to review "when it appears that such a question was actually considered and decided"); *Habeas Relief for State Prisoners*, 38 Geo. L.J. Ann. Rev. Crim. Proc. 892, 942 n.2722 (2009) (collecting cases). We now address the merits of the *Beck* jury instruction claim.

### III.

The Ohio jury instructions in this case impose two rules on the jury. The first is a mandatory death penalty instruction that was recently upheld by the Supreme Court in a 5-4 decision in *Kansas v. Marsh*, 548 U.S. 163 (2006) (overruling Kansas Supreme Court invalidation of Kansas' mandatory death sentence), combined with an acquittal-first rule that tells the jury that, before they can consider mercy and some form of life imprisonment, they must determine whether the factors are present requiring imposition of the mandatory death penalty. Under this rule, the jurors may not extend mercy to the defendant until after they have weighed aggravators and mitigators and have acquitted the defendant of the elements that automatically impose the death penalty. The issue on the merits is the constitutionality of the combined effect of two rules that together require the jury as a first step, before considering mercy, to make a decision to acquit the defendant of the mandatory death sentence. Does this first step process requiring a decision on the mandatory death penalty interfere with the jury's ability to give independent weight to factors that could lead one or more jurors to prefer life imprisonment? Does the combined effect of the two rules run the risk of causing one or more jurors to neglect or omit the serious consideration of mercy and life imprisonment as a choice? Justice Stevens in *Spisak* explains the answer to these questions: the Ohio set of jury instructions, both by their literal language and their purpose, only allows for consideration of a sentence of life after consideration of the mandatory death penalty is completed by a verdict of acquittal.

Since his direct appeal in 1996, Mitts has argued that the jury instructions in his case were unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

The trial court in the *Mitts* case gave the jury a mandatory death penalty, acquittal-first instruction:

> When all 12 members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances in each separate count with which Harry D. Mitts, Jr. has been found guilty of committing outweigh the mitigating factors, if any, then you must return such finding to the Court.
>
> I instruct you as a matter of law that if you make such a finding, then you must recommend to the Court that the sentence of death be imposed on the defendant Harry D. Mitts, Jr.
>
> On the other hand, after considering all of the relevant evidence raised at trial, the evidence and testimony received at this hearing and the arguments of counsel, you find that the state of Ohio failed to prove beyond a reasonable doubt that the aggravating circumstances with which the defendant, Harry D. Mitts, Jr., was found guilty of committing outweigh the mitigating factors, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court.

(R. 42, Tr. 153-55, Jury Instructions, App. 2436-38) (emphasis added). In an opinion by Justice Stevens, the Supreme Court held unconstitutional a mandatory death penalty rule that required the jury to return a death penalty verdict upon a finding that aggravators outweighed mitigators combined with a rule that the jury could not first consider "the third option" of a life sentence based on a lesser-included offense. 447 U.S. at 625. In *Spisak*, based on the same instruction before us in the instant case, Justice Stevens concluded that the instructions requiring the jury to first consider a mandatory death penalty without considering a "third option" of life imprisonment created the same basic constitutional error as in the *Beck* case:

> The acquittal-first jury instructions used during Spisak's penalty phase interposed before the jury the same false choice that our holding in *Beck* prohibits. By requiring Spisak's jury to decide first whether the state had met its burden with respect to the death sentence, and to reach that decision unanimously, the instructions deprived the jury of a meaningful opportunity to consider the third option that was before it, namely, a life sentence. Indeed, these instructions are every bit as pernicious as those at issue in *Beck* because they would have resulted in a new trial and that, in any event, they could not give effect to their determination that a life

> sentence was appropriate unless and until they had first convinced each
> of their peers on the jury to reject the death sentence.

*Spisak*, 130 S. Ct. at 690-91.  Having explained this problem of requiring the jury to focus first and decide first on the mandatory death penalty sentence, Justice Stevens concludes, "*Spisak* and the Court of Appeals both correctly assailed the jury instructions at issue in this case, but in my view *Beck* provides *the proper basis in clearly established federal law* to conclude the instructions were unconstitutional."  *Id*. at 691 (emphasis added).[2]

The jury instructions at issue in *Spisak* are the same as those given by the *Mitts* Court.  The Ohio Supreme Court held in *Mitts* that under Ohio law the jury could consider "possible life sentences" only "if all twelve members of the jury found that the State had not proved that the aggravating circumstances" predominated.  690 N.E.2d at 531.  The *Mitts* Court cited Ohio Revised Code § 2929.03(D)(2) for its interpretation that the jury must look first to the mandatory death penalty requirement.[3]  Because *Beck* compels that proper instructions must make clear that the jury does not have to complete its death deliberation before considering a life sentence, Mitts' due process rights were violated.  Under *Beck*, a jury instruction violates due process if it requires a mandatory

---

[2] Our dissenting colleague takes issue with Justice Stevens' statement that the *Beck* case is "clearly established federal law" for AEDPA purposes, claiming simply that "a concurring opinion" cannot constitute "clearly established law."  Our colleague does not understand that we are simply agreeing with Justice Stevens that *Beck* itself, decided thirty years ago, is the clearly established law that invalidates these jury instructions.

In addition, the fact that *Mitts* did not specifically cite *Beck* in the court below in attacking these same jury instructions is not a waiver of Mitts' claim that, as Justice Stevens puts it, "the instructions deprive the jury of a meaningful opportunity to consider a third opinion that was before it, namely, a life sentence."  This is the same basic argument *Mitts* made below and on appeal, except in a slightly different dress made by the same dress-maker out of the same cloth.  We should not be distracted from addressing a fundamental constitutional argument by the label in the back, especially in a death penalty case.  We should not struggle to avoid deciding fundamental constitutional issues so that the prisoner can go to his death without our considering a claim that may allow him to live.

[3] This Ohio statute provides:

> If the jury unanimously finds by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.  Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

death penalty sentence that can only be avoided by an acquittal before the jury has an opportunity to consider life imprisonment. 447 U.S. at 645. Accordingly, the holding of the Supreme Court of Ohio was contrary to clearly established federal law as determined by the Supreme Court of the United States in *Beck v. Alabama*; and we hereby remand the case to the district court with instructions to issue a writ of habeas corpus vacating Mitts' death sentence unless the State conducts a new penalty phase proceeding within 180 days of remand.

## IV.

On the issue of ineffective assistance of counsel at the guilt phase of the trial, Mitts argues that his counsel completely failed to investigate the case and presented a single defense – amnesia caused by alcohol blackout – that counsel knew was unsupported by the facts and the law. He contends that counsel suppressed facts, ignored what Mitts and their expert told them, and presented a witness whom they knew would eviscerate their theory. As a result, Mitts argues that his counsel failed to subject the state's case to meaningful adversarial testing and created a presumptively unfair trial.[4]

We review a district court's decision regarding a habeas petitioner's claim of ineffective assistance of counsel de novo. *Avery v. Prelesnik*, 548 F.3d 434, 436 (6th Cir. 2008). The standard for whether counsel's ineffectiveness fell below the minimum requirements of the Sixth Amendment contains two components: (1) the deficient performance of counsel as compared to an objective standard of reasonable performance,

---

[4] Mitts argues at length that his first claim—ineffective assistance of counsel in the guilt phase of trial—falls within the ambit of *United States v. Cronic*, 466 U.S. 648 (1984). A companion case to *Strickland v. Washington*, 466 U.S. 668 (1984), *Cronic* provides three situations in which *Strickland*'s prejudice requirement is presumed to be satisfied. Mitts seeks to invoke the *Cronic* situation whereby prejudice may be presumed if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. In 2002, the Supreme Court clarified that *Cronic*'s presumption applies only where defense counsel completely fails to oppose the prosecution throughout the guilt or penalty phase as a whole. *Bell v. Cone*, 535 U.S. 685, 697 (2002). Taking their cue from *Bell*, lower courts have all but created a bright-line distinction between counsel who provide no representation at all (*Cronic*) and those who provide bad or even deplorable assistance (*Strickland*). *See Moss v. Hofbauer*, 286 F.3d 851, 861 (6th Cir. 2002) (collecting cases). In *Moss*, the court's majority found that trial counsel, "good or bad, was clearly not the equivalent of being physically or mentally absent . . . [t]his requires us to evaluate her performance under the *Strickland* standards, not under the *Cronic* rule of per se prejudice." *Id*. at 862. Accordingly, the district court's implicit finding that *Cronic* is inapplicable is correct, and *Strickland* governs both of Mitts' ineffective assistance of counsel claims.

and (2) that there is a reasonable probability that the lawyer's errors prejudiced the outcome of the proceedings. *Strickland*, 466 U.S. at 687-88. "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. Reviewing courts must try to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689. To satisfy the prejudice prong of the *Strickland* test, the petitioner must show that a reasonable probability exists that, but for his counsel's unprofessional errors, the results of the proceeding would have been different. *Id*. at 694; *Johnson v. Bell*, 525 F.3d 466, 486-87 (6th Cir. 2008). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To prevail on an ineffective assistance of counsel claim, Mitts must satisfy both the deficient performance and prejudice prongs of *Strickland. See Harries v. Bell*, 417 F.3d 631, 636 (6th Cir. 2005).

We agree with the district court that counsel's performance during the guilt phase of trial was constitutionally deficient. The performance of Mitts' lead defense counsel, Thomas Shaughnessy, was deficient because he pursued a blackout defense despite knowing that Mitts could in fact recall most of the events of August 14 and 15, 1994, and because he did not have any evidence to support the theory that a person who suffered an alcoholic blackout would have been unable to form the specific intent to kill.

In an affidavit filed in support of his state court post-conviction petition, Mitts said his lawyer told him that he should say he had a blackout when the shootings occurred. (J.A. 634.) At his deposition for the federal habeas proceedings, Mitts described what he remembered about the shootings, indicating that although there were gaps in his memory he was able to recall both his internal struggles about his actions and most of the actions themselves. Mitts testified that he told Shaughnessy everything that he said in his deposition and that Shaughnessy told him to say that he did not remember. Mitts apparently followed the advice; in his unsworn statement in the mitigation phase

of trial, he stated that he "never meant for any of this to happen" and said he only remembered bits and pieces of what happened.  (J.A. 2360-62.)

Susan Evanson, a mitigation specialist who worked on Mitts' case, swore in an affidavit that Mitts "revealed to me that he was not in a blackout state at the time of his offenses, but was told by his attorney that under any circumstances [not] to tell anyone that he remembered anything regarding the charges."  (J.A. 498-99.)  Evanson had compiled a social history of Mitts by interviewing him and his family members and submitted a report to Dr. James Eisenberg, a psychologist appointed by the court to assist Mitts in the mitigation phase.  Mitts first told Evanson that he did not remember the events of August 14-15, 1994, but he later told her that he did not have a blackout and that Shaughnessy told him not to tell anybody the truth.  Evanson told Dr. Eisenberg what Mitts had told her.  According to Evanson, Shaughnessy did not meet with her or Dr. Eisenberg until the day that Dr. Eisenberg testified at the mitigation phase of trial.

In his affidavit, Dr. Eisenberg stated that Mitts told him that his attorneys insisted he maintain during his interview and trials that he was in a blackout during his crimes. Dr. Eisenberg said that he did not believe that Mitts suffered a blackout and that Shaughnessy refused to accept his opinion about Mitts' mental state during the crimes. Dr. Eisenberg also stated that Shaughnessy was only interested in the blackout theory and did not want to address other psychological issues.  In his deposition, Dr. Eisenberg testified that he refused to go along with Shaughnessy's blackout theory because Mitts never told him that he blacked out.  Dr. Eisenberg said that Mitts was able to give a fairly detailed account of the events that led to his arrest, and he told Shaughnessy he did not think Mitts had a blackout.  The psychiatrist also testified that Mitts told him it was his attorney's idea to say he had a blackout.

Accordingly, if Mitts, Evanson, and Dr. Eisenberg are to be believed, Shaughnessy pursued the blackout defense even though he knew that Mitts could remember many of the events of August 14-15, 1994, and instructed Mitts to lie about his memory.  Shaughnessy is deceased, and nothing in the record from his co-counsel disputes Mitts' account or those of Evanson and Dr. Eisenberg.

The record also establishes that Shaughnessy knew, or should have known, that psychiatrist and defense expert Sonya McKee would not support the theory that someone who was intoxicated to the point of being unable to recall his actions later would have been unable to form specific intent. Shaughnessy tried to ask that question of Dr. McKee in the competency hearing on September 21, 1994, but the trial court sustained the prosecution's objection. Shaughnessy told Dr. McKee that he would definitely ask her the question again in front of the jury. Later in the hearing, Dr. McKee explained that although an intoxicated person may not remember his actions later, at the time he is conscious and engaged in activities. Dr. McKee also testified that Mitts' explanation that he remembered doing something without understanding why or what he was doing was not consistent with an alcohol blackout. During trial on November 2, 1994, Shaughnessy prefaced his question on this subject by saying, "[l]et me ask you the question, Doctor, that I haven't asked you before or we haven't got to before." (J.A. 2068.) He then asked whether a person who is unable to lay down memories would have the ability to form the specific intent to cause a particular thing to happen. Dr. McKee answered, "Yes." (J.A. 2069.) The record thus demonstrates that Shaughnessy should have recognized that Dr. McKee would not support his lack of specific intent theory, that Shaughnessy did not question Dr. McKee about his theory between the competency hearing and the trial, and that Shaughnessy called Dr. McKee as a witness with no reason to believe she would support his theory. Shaughnessy was forced to concede his defense in closing argument.

In sum, Shaughnessy's sole theory at trial was that Mitts lacked the requisite intent to commit murder as a result of voluntary intoxication, yet the defense's only expert witness directly contradicted that theory and Shaughnessy should have been aware that Mitts did remember much of the events. The defense's expert, Dr. McKee, testified that Mitts acted purposefully and intentionally—thereby not only destroying Mitts' sole defense but also proving a key element of the prosecution's case. Such performance alone would enable us to find counsel deficient for failing to fully investigate before presenting witness testimony. *See Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000). Sadly, counsel's deficiency ran even deeper. Even a preliminary

conversation with Dr. McKee would have revealed that she would not have supported a defense of voluntary alcohol intoxication for any defendant in any trial under any circumstances. It was her clinical opinion than *anyone*—not only Mitts—would pass out before alcohol intoxication rendered them unable to form intent. (J.A. 1200.) Moreover, the record shows that trial counsel had a hunch that Dr. McKee would contradict his intoxication defense and *still* placed her on the stand. (J.A. 1206 (defense counsel commented during side bar: "the lady [Dr. McKee], as I guessed that she would, was going to say that the defense is bull shit, which is about what she's saying.").) Shaughnessy's failure to do the minimal investigation required to determine his own expert's opinion about a matter central to his theory of the defense was objectively unreasonable and constituted deficient performance under *Strickland* and *Combs*.

Notwithstanding trial counsel's deficiencies, we agree with the district court that Mitts does not establish prejudice under *Strickland*. Shaughnessy did concede that Mitts shot the victims and abandoned the alcohol blackout defense after Dr. McKee's testimony, leaving Mitts without a viable defense theory at trial. Shaughnessy did not, however, bring out damaging information about Mitts, make him seem dangerous, or express contempt for him. He cross-examined the state's witnesses and brought out evidence in the guilt phase that laid the groundwork for the mitigation phase of trial.

Moreover, while Dr. McKee contradicted Mitts' voluntary intoxication defense, Mitts cannot show that another expert would have testified that Mitts was too intoxicated to form the specific intent to kill. Dr. Eisenberg testified during the mitigation phase that Mitts was highly intoxicated on the night of the offense but did not testify that Mitts lacked the intent to shoot the victims. (J.A. 1471-73 (testifying that the majority of the individuals whom he has evaluated as having alcohol impairment "were able to have knowledge and purpose at the time [of the offense].").) As Mitts' habeas counsel has noted, neither intoxication nor blackout was a defense available to Mitts. Neither the facts nor the law supported such a defense and the evidence of Mitts' guilt was overwhelming.

Even at this stage in the proceedings, Mitts offers no evidence of a trial strategy that may have produced a different result. As Mitts implies, the only alternative approach that his counsel could have reasonably attempted was a full concession defense. The Supreme Court recognized the merits of such a strategy in *Florida v. Nixon*, 543 U.S. 175 (2004) (defense attorney's concession of guilt in a capital trial—in light of overwhelming evidence against his client—did not constitute ineffective assistance of counsel). By admitting guilt from the beginning, the attorney will "impress the jury with his candor and his unwillingness to engage in 'a useless charade.'" *Id.* at 192 (quoting *Cronic*, 466 U.S. at 656-57 n.19).

It follows from *Nixon* that overwhelming evidence of guilt may signal to an attorney that a concession defense could prove an effective tactic, but we cannot extend the dicta of *Nixon* to find that counsel's failure to implement a concession defense constitutes ineffective assistance of counsel. Obviously, Mitts cannot show that a full concession defense could have changed the result of the proceedings at the guilt phase; the jury would, of course, have found him guilty. Mitts also cannot demonstrate that a concession defense at the guilt phase would have resulted in a lighter penalty at sentencing because such a tactic relies upon unprovable factors, such as the credibility of the lawyer and the morality and sympathy of the jury.

Lacking any viable alternative trial theory, Mitts cannot demonstrate "that there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt about his guilt." *Hicks v. Collins*, 384 F.3d 204, 215 (6th Cir. 2004) (citing *Strickland*, 466 U.S. at 695). Hence, Mitts fails to satisfy the prejudice standard of *Strickland* and his first claim must fail.

**V.**

Mitts also claims that his trial counsel failed to investigate his case and failed to present evidence of viable mitigating factors. He charges that his counsel relied upon the unsupportable theory of alcohol-induced blackout that was discredited during the guilt phase of trial.

We also agree with the district court's assessment of counsel's performance during the penalty phase of trial. Counsel's chief deficiency during the guilt phase carried over into the mitigation phase when counsel continued to focus on alcohol intoxication. Despite having already received a guilty verdict that nullified the intoxication defense and the fact that Dr. Eisenberg did not believe that Mitts blacked out and that Dr. McKee had rejected the idea that a blackout meant that Mitts was so intoxicated that he could not form specific intent, counsel told the jury that alcohol intoxication was the "only thing that may mitigate." (J.A. 1387.) Shaughnessy also appeared to attack his own witnesses by comparing psychiatrists to those who believed in witches and by describing Mitts as a monster who should never be released from prison. It could be argued that Shaughnessy thought that the jurors would be skeptical of psychological explanations for Mitts' actions and that he wanted to assure the jury that, because of Mitts' age, he would die before becoming eligible for parole. These possible strategic reasons for parts of Shaughnessy's approach do not comprise a well-thought-out mitigation strategy. The district court correctly found that defense counsel did not conduct a reasonable investigation of alternative theories of mitigation and thus fell below the contemporaneous standards established by the Supreme Court and the American Bar Association. *See Wiggins v. Smith*, 539 U.S. 510, 522-23, 527 (2003); *Strickland*, 466 U.S. at 691; ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989); 1 ABA Standards for Criminal Justice 4-4.1, commentary, pp. 5-55 (2d ed. 1982).

In order to assess whether prejudice resulted from counsel's failures at the penalty phase of trial, we "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. In order to establish prejudice, "the new evidence that habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Brooks v. Bagley*, 513 F.3d 618, 627 (2008) (internal citations omitted). On appeal, Mitts argues that he suffered prejudice at sentencing because trial counsel failed to present evidence of Mitts' avoidant personality disorder, full-scale IQ of 85, and "violent fantasy life." Dr. Eisenberg was unable, however, to link any event or

events in Mitts' past to his actions on August 14 and 15, 1994, nor did he find or suggest that Mitts had an organic brain injury or a mental illness that might have contributed to his actions. His testimony that Mitts had no significant prior record and showed ability to adjust to prison life would have been cumulative to the evidence that was introduced in Mitts' mitigation hearing. The lay witnesses who testified on Mitts' behalf at trial portrayed him as a gentle man who loved his daughter and was seemingly incapable of the crimes he committed. Dr. Eisenberg's expanded explanation of the role of alcohol in Mitts' crimes would not likely have had much impact given the ineffectiveness of this evidence at trial. Mitts fails to show a reasonable probability that, but for counsel's failure to introduce this evidence at trial, he would have received a different verdict. We agree with the district court that the jury would not have given sufficient mitigation weight to Mitts' avoidant lifestyle, fascination with violent movies, or low normal intelligence to overcome the substantial aggravating factors in this case, to wit: killing a man while yelling a racial epithet and knowingly murdering a police officer in the performance of his duties.

The district court also correctly points out that the mitigation weight of such evidence is significantly lighter than the mitigation evidence in cases where prejudice has been found. *See, e.g., Rompilla v. Beard*, 545 U.S. 374 (2005) (petitioner was raised by alcoholic parents, was regularly beaten by his father, and grew up in a filthy home, attending school "in rags"); *Wiggins*, 539 U.S. at 523-25 (petitioner's mother was a chronic alcoholic and, on at least one occasion, left petitioner and his siblings alone for days without food; petitioner was shuttled from foster home to foster home and displayed emotional difficulties); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (petitioner's parents were imprisoned for criminal neglect of petitioner and his siblings and petitioner had nightmarish childhood, was severely and repeatedly beaten by his father and was borderline mentally retarded); *Harries v. Bell*, 417 F.3d 631, 639-40 (6th Cir. 2005) (petitioner had traumatic childhood, suffered significant physical abuse and had a mental illness); *Frazier v. Huffman*, 343 F.3d 780, 794 (6th Cir. 2003) (petitioner had brain injury that impaired brain functioning); *Hamblin v. Mitchell*, 354 F.3d 482,

490-91 (6th Cir. 2003) (petitioner grew up in environment of extreme poverty, neglect, violence, and instability and suffered from a mental disorder).

Once the jury was prevented by its instructions from considering mercy and life imprisonment until after an acquittal on the mandatory death penalty elements, the strength of the State's case and the brutal and senseless nature of the crime made it unlikely that the deficiencies in counsel's performance would have made any difference. The post-conviction evidence developed by habeas counsel does not convince us that trial counsel could have developed a basis for leniency so long as the structure of the jury's deliberations required that the jury first acquit Mitts of the mandatory death penalty.

## VI.

Accordingly, as aforesaid, we affirm the District Court's conclusions as to ineffective assistance of counsel but agree with Justice Stevens' conclusions respecting the acquittal-first jury instructions and issue the writ of habeas corpus on that ground. The jury instructions prevented counsel from having a chance to convince the jury that life imprisonment was a viable option.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

SILER, Circuit Judge, concurring in part and dissenting in part. I concur in the conclusions in the majority opinion in Parts IV. and V., that is, I concur in the conclusions that Mitts has failed to satisfy the prejudice standard in both claims under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Nevertheless, I would not comment upon the deficient performance prong under *Strickland*, because I believe it to be unnecessary.

However, I differ with the majority in its conclusion under Part III., that a writ of habeas corpus should issue because the jury instructions were unconstitutional. First, I would not authorize the issuance of a writ of habeas corpus in this case based upon the concurring opinion by Justice Stevens in *Smith v. Spisak*, 554 U.S. ___, 130 S. Ct. 676, 689 (2010). It was not raised by Mitts in his brief in this court nor in the district court, and it was only brought up by our court during oral argument. Certainly, a concurring opinion in a recent case does not constitute "clearly established Federal law" as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). The holding in *Spisak* was "that the state court's decision upholding these forms and instructions was not 'contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' in *Mills* [486 U.S. 367]." *Spisak*, 130 S. Ct. at 684. It also held that this court erred when it found jury instructions unconstitutional because they required "the jury to unanimously reject the death sentence before considering other sentencing alternatives." *Id*. But the Court said that it had not "previously held jury instructions unconstitutional for this reason." *Id*. Like Mitts, Spisak never cited *Beck v. Alabama*, 447 U.S. 65 (1980), in the Supreme Court or in any lower court.

Moreover, the Supreme Court has never extended *Beck* to cover penalty-phase jury instructions. In his post-argument brief, Mitts has failed to cite any Supreme Court

case which applied *Beck* to penalty-phase instructions. Instead, he cites only *Murtishaw v. Woodford*, 255 F.3d 926, 972 (9th Cir. 2001).

The Supreme Court found that the jury instructions in *Spisak*, just like the ones in our case, meet the test under AEDPA, 28 U.S.C. § 2254 (b)(1), that is, that the state court's decision on the mitigation jury instructions was not contrary to, or an unreasonable application of, clearly established Federal law.

I also believe that Mitts is now precluded from raising the *Beck* issue at this late time. He has never challenged his jury instructions under *Beck*, either in state court or in his habeas petition. Such an issue was raised in *Goff v. Bagley*, 601 F.3d 445 (6th Cir. 2010), where we would not rule on a last-minute *Beck* question when "neither Goff nor any previous court below referred to *Beck* . . . or identified any other precedent from th[e Supreme] Court setting forth this rule." *Id*. at 459. (quoting *Spisak*, 130 S. Ct. at 684). Thus, we declined in *Goff* to consider the case under the *Beck* principle, even though the dissent suggested that we should. The majority herein suggests that the *Beck* principle was raised by Mitts because the Ohio Supreme Court referred to *State v. Thomas*, 533 N.E. 2d 286, 293 (Ohio 1988), which cited *Beck*. I do not think that Mitts preserved this issue, but even if he did, *Beck* does not apply in our situation. I would affirm the district court's denial of the writ of habeas corpus.